UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

FILED

02 AUG 26 PH 3: 51

U. . DISTRICT COURT
N.D. OF ALABAMA

ENTERED

AUG 2 6 2002

| | |
|---|---|
| GLADYS JENKINS, DENISE LEVERT, DAVID WILLIAMS, PEGGY JOHNSON, and SHARON GRIFFIN, on behalf of themselves and all similarly situated persons, ) ) ) ) ) | |
| Plaintiffs, ) | |
| vs. ) | Civil Action No. CV-02-C-1057-S |
| BELLSOUTH CORPORATION, ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

This case has been referred by the Clerk to the undersigned judicial officer for the limited

purpose of ruling upon plaintiffs' motion to disqualify the Birmingham, Alabama, law firm of Lehr

Middlebrooks Price & Proctor, P.C., from appearing as local counsel for defendant.[1]

## I. PROCEDURAL BACKGROUND

The action was instituted by five African American individuals who are either current or

former employees of defendant, BellSouth Corporation. They allege that defendant has, "for many

years,"[2] engaged in systemic discrimination against members of their race when making promotions

and determining compensation through the use of "biased testing mechanisms and excessively

subjective decision-making practices"[3] in violation of 42 U.S.C. § 1981 and Title VII of the Civil

---

[1] See doc. no. 5 (motion filed May 15, 2002). (References herein to "doc. no. ___" are to the numbers assigned pleadings by the Clerk.) Chief Judge U.W. Clemon, the judicial officer to whom the action was assigned when the complaint was filed, entered the following order on May 23, 2002: "The Clerk of the Court is hereby directed to refer Plaintiffs' Motion to disqualify to another Article III judge of this Court for hearing and disposition. See Robinson v. Boeing Company, 79 F.3d 1053 (11th Cir. 1996). Pending a decision on the disqualification motion, all other matters pertaining to this case are hereby STAYED." Doc. no. 10.

[2] Doc. no. 1 (Complaint) ¶ 1, at 1.

[3] Id. ¶ 24, at 8.



Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*[4] Among other employment practices challenged, plaintiffs say that BellSouth discriminates against African American hourly and salaried employees seeking promotion to "entry level management positions" through the use of a three-component selection procedure that allegedly "has not been validated in accordance with the Uniform Guidelines for Employee Selection Procedures, is not job-related, is not consistent with business necessity, and . . . has an adverse impact on African American employees."[5] Plaintiffs request that two classes be certified pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3), consisting of:

> a. all current and former African American hourly employees who have been employed by BellSouth, including any Operating company in which BellSouth at the time of employment maintained a controlling interest, at any time from April 29, 1998, through the present[; and,]

> b. all current and former African American salaried employees at or below level C (grade 59) who have been employed by BellSouth, including any Operating Company in which BellSouth at the time of employment maintained a controlling interest, at any time from April 29, 1998, through the present.[6]

The action was commenced on April 29, 2002, with the filing of a complaint[7] and the submission of a "civil cover sheet" as required by local rules of this court.[8] The case was randomly

---

[4] *Id.* ¶ 1, at 1.

[5] *Id.* ¶ 25(a)(i), at 9. The selection procedure criticized by plaintiffs is referred to as the "Access to Management" test device. The *Uniform Guidelines on Employee Selection Procedures* represent a joint statement of the Equal Employment Opportunity Commission, the Civil Service Commission, the Department of Labor, and the Department of Justice as to the characteristics of acceptable selection procedures. *See Adoption of Four Agencies of Uniform Guidelines on Employee Selection Procedures*, 43 Fed. Reg. 38,290-38,315 (Aug. 25, 1978); *see also Ensley Branch of N.A.A.C.P. v. Seibels*, 616 F.2d 812, 816 n.11 (5th Cir. 1980).

[6] Doc. no. 1 (Complaint) ¶ 28, at 13.

[7] *See* Fed.R.Civ.P. 3 ("A civil action is commenced by filing a complaint with the court.").

[8] Local Rule LR3.1 provides: "A completed civil cover sheet (Form JS-44c) shall be submitted to the Clerk with the initial civil complaint or notice of removal filed in this court by a litigant represented by counsel."

assigned, through use of a computerized assignment roll, to Chief Judge U.W. Clemon.[9]  The

complaint was designated file docket number ("doc. no.") 1 by the Clerk.  Eleven days later, the

following "Entry of Appearance" was filed and logged by the Clerk as doc. no. 2:

> PLEASE TAKE NOTICE of the appearance of Terry Price of Lehr
> Middlebrooks Price & Proctor, P.C., and Grace E. Speights and George A. Stohner
> of Morgan, Lewis & Bockius, LLP, as counsel for Defendant in the above-captioned
> matter.

Terry Price is Judge Clemon's nephew.  His appearance therefore implicated 28 U.S.C. §

455(b)(5)(ii), requiring any justice, judge, or magistrate judge of the United States to recuse himself

when a person within the third degree of relationship to the judge is acting as a lawyer in the

proceeding.  The following week, plaintiffs filed the subject motion, stating in part:

> Morgan Lewis & Bockius, LLP, an extremely large law firm with offices in
> 13 cities (but not Birmingham) entered its appearance as counsel for BellSouth on
> May 10, 2002.  To sign its entry of appearance as local "Of Counsel," Morgan Lewis
> chose Lehr Middlebrooks Price & Proctor, PC, a small Birmingham firm whose
> members include Judge Clemon's nephew, Terry Price.  Under federal law, Judge
> Clemon is required to disqualify himself from a proceeding in which "a person within
> the third degree of relationship" to either himself or his spouse is "acting as a lawyer
> in the proceeding" or is "known by the judge to have an interest that could be
> substantially affected by the outcome of the proceeding."   28 U.S.C. §
> 455(b)(5)(ii)–(iii).  In the Eleventh Circuit, this means that the entry of his nephew's
> law firm into a case always automatically disqualifies Judge Clemon.  *See Potashnick
> v. Port City Constr. Co.*, 609 F.2d 1101, 1113 (5th Cir. 1980).

---

[9] During the hearing conducted by this court in Birmingham on July 26, 2002, Sharon Harris, Chief Deputy
Clerk for the Northern District of Alabama, explained the manner in which a case is assigned:

> A civil case, when it's filed in our court, is assigned randomly using a computerized
> assignment roll.  Several different decks are optional for cases depending upon the type of case.  If it's
> a triable case, one that would potentially go to trial rather than one that would be decided on briefs like
> a social security case, it's drawn from the divisional deck from a panel of judges who take triable cases
> in that division.  For example, in the Southern Division [in which the present action is docketed], all
> of the judges, with the exception of Judge Propst, participate.  And the computerized program
> automatically draws a judge and assigns a case number for that case immediately, as soon as the runner
> or attorney presents the case for filing.

Transcript of July 26, 2002 Hearing ("Tr."), at 66-67.

Plaintiffs file this motion seeking to prevent BellSouth from selectively forcing the recusal of Judge Clemon in this race discrimination class action by retaining the law firm of his nephew as local counsel. BellSouth's strategy of forced recusal has a long and unfortunate history in this district, which has been noted by federal judges in Birmingham, on the Court of Appeals for the Eleventh Circuit, and by Judge Clemon himself. *See Robinson v. Boeing Co.*, 79 F.3d 1053 (11th Cir. 1996) (attached hereto as Ex. A); *USX Corp. v. Tieco, Inc.*, 929 F. Supp. 1460 (N.D. Ala. 1996) (attached hereto as Ex. B).

In response to plaintiffs' motion, BellSouth filed a "notice of newly discovered fact" on May 31, 2002, reading in pertinent part as follows:

During the course of [the] Memorial Day weekend, it first occurred to Terry Price that Judge Clemon's nephew, Billie Clemons, Jr., may be a member of one of the putative classes alleged in this matter. (Price Decl. at ¶ 3, attached hereto as Exhibit A).[10] Mr. Price contacted BellSouth regarding this development on May 28, 2002, and confirmed that Mr. Clemons is employed in an hourly position with BellSouth. (*Id.* at ¶ 3). Specifically, Mr. Clemons is a Facility Technician in Birmingham who is paid on an hourly basis pursuant to a collective bargaining agreement. (Chastain Decl. at ¶ 3, attached hereton as Exhibit B). In the Complaint, Plaintiffs define one of their alleged classes as "all current and former African American hourly employees who have been employed by BellSouth, including any Operating Company in which BellSouth at the time of employment maintained a controlling interest, at any time from April 29, 1998, through the present." (Compl. at ¶ 28(a)). Accordingly, Mr. Clemons is a putative class member in this action.[11]

BellSouth asserts, on the basis of the foregoing allegation, that "it is clear . . . Judge Clemon could not hear this case under any circumstances,"[12] because federal law requires a judicial officer to disqualify himself when a person within the third degree of relationship to the judge is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding. *See*

---

[10] In a footnote to this citation, Mr. Price records that "Billie Clemons, Jr. spells his last name with a[n] 's.' (Price Decl. at ¶ 3)."

[11] Doc. no. 15, at 2-3.

[12] *Id.* at 6.

28 U.S.C. § 455(b)(5)(iii).[13]

## II. DIGRESSIVE ISSUES

Before proceeding to a discussion of the substantive facts and legal materials presented, two contentious charges raised in the parties' briefs need to be laid aside: *i.e.*, BellSouth's accusation that plaintiffs manipulated the initial assignment of this action to Judge Clemon; and, plaintiffs' indictment of the truthfulness of some statements made by Mr. Price during this court's July 26, 2002 hearing.

### A.    The "Related Case" Reference and Judge Shopping

When plaintiffs' local attorney submitted the complaint commencing this action to the Clerk for filing, he tendered not only a check for payment of the required filing fee, but also a "JS 44 Civil Cover Sheet (Rev. 12/96)." The civil cover sheet is required by Local Rule LR3.1,[14] and the form itself was approved by the Judicial Conference of the United States in September 1974, and is promulgated by the Administrative Office of United States Courts.[15] Section VIII of the cover sheet

---

[13] In the parts here pertinent, § 455 requires any justice, judge, or magistrate judge of the United States to recuse himself (or herself) when:

> (5)  He or his spouse, *or a person within the third degree of relationship to either of them*, or the spouse of such a person:
>
>> (i) Is a party to the proceeding, or an officer, director, or trustee of a party;
>>
>> (ii) *Is acting as a lawyer in the proceeding*;
>>
>> (iii) *Is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding*;
>>
>> (iv) Is to the judge's knowledge likely to be a material witness in the proceeding.

28 U.S.C. § 455(b)(5) (emphasis supplied).

[14] *See supra* note 8.

[15] Tr. 67-68 (testimony of Sharon Harris, Chief Deputy Clerk of the U.S. District Court for the Northern District of Alabama).

is used to reference a related, pending case, if any, and requires counsel to insert the docket number and corresponding judge's name. In this instance, plaintiffs' counsel designated the present action as being related to "CV-93-1530-S," assigned to "Judge U.W. Clemon." That case, styled *Carl Wright et al. v. South Central Bell, BellSouth Telecommunications, Inc., Communications Workers of America, et al.*, is a complex class action that was commenced on July 30, 1993. The case was tried non-jury, in a bench trial conducted by Chief Judge Clemon, but it still is pending entry of findings of fact, conclusions of law, and a final judgment.

BellSouth asserts that the reference to *Wright v. South Central Bell* on the civil cover sheet submitted with the complaint demonstrates that plaintiffs manipulated the initial assignment to Judge Clemon:

> As BellSouth pointed out in its Memorandum of Law in Opposition to the Motion to Disqualify Terry Price ("Opposition"), contrary to Plaintiffs['] repeated assertions, this case was not randomly assigned to Judge Clemon through the "spin of the wheel."[16] On the civil coversheet [sic] filed with their Complaint, *Plaintiffs' counsel* designated this case as related to an action currently pending before Judge Clemon, even though this case does not involve the same parties, transactions or issues as the earlier case. Ironically, it is *Plaintiffs* that have engaged in "judge shopping," not BellSouth. Thus, Plaintiffs' assertion that the "random" judicial assignment process would be undermined by Judge Clemon's recusal is simply not true.[17]

---

[16] In the original memorandum of law submitted in opposition to plaintiffs' motion to disqualify, BellSouth made the following accusation:

> Throughout their papers, Plaintiffs claim that this case was "randomly assigned" to Judge Clemon and suggest that BellSouth is unethically attempting to subvert the judicial assignment process. Plaintiffs, however, fail to disclose to the Court that they designated this case on their civil cover sheet as related to an action currently pending before Judge Clemon, even though this case does not involve the same parties, transactions or issues as the earlier case. (*See* Civil Cover Sheet attached hereto as Exhibit C).

Doc. no. 11, at 5 n.2.

[17] Doc. no. 27 (Defendant's Surreply in Opposition to Plaintiffs' Motion to Disqualify), at 6 (emphasis in original) (citations omitted).

For that reason, this court asked plaintiffs' counsel the following question during the hearing

conducted on July 26, 2002:

> THE COURT: What is it about this case that caused the plaintiffs' counsel
> to state on the civil cover sheet that it would be related to the case that is still pending
> before Judge Clemon, CV-93-1530?
>
> . . .
>
> MS. BHATT: I don't know how specifically I am going to be able to answer
> that. My understanding is that the Wright case had to do with testing issues, and
> many of those tests, a later generation of those tests[,] are at issue in our case. And
> that because that case was still open, and there had, in fact, been a bench trial on
> many of those issues that were left unresolved, that it would have been appropriate
> to, or it would have been a legitimate related assignment, if, in fact, this district had
> a related case assignment procedure, which my understanding is it doesn't. What
> happened in that case is Byron Perkins, who is our local counsel in this case, was
> filing the complaint, and on the civil cover sheet it asks, "Is there a related case that
> you are aware of?" He felt obligated to put that on there; I think with the knowledge
> that it wasn't going to have much effect because there is no related case assignment
> procedure, and, in fact, the case was randomly assigned. I mean, you can verify that
> with the clerk's office. Mr. Perkins can speak to that. But that's why the box was
> checked.[18]

Sharon Harris, Chief Deputy Clerk, confirmed that plaintiffs' reference to *Wright v. South*

*Central Bell* on the civil cover sheet submitted in conjunction with the complaint commencing this

action had no effect upon assignment of the case to Chief Judge Clemon.

> THE COURT: I direct your attention to Section VIII, which pertains to a
> related case or cases, if any. Now it has been alleged in this action that's been
> assigned to me, that the case before me was not randomly assigned to Judge Clemon;
> rather, on the civil cover sheet filed with the complaint, plaintiffs' counsel designated
> this case as related to an action currently pending before Judge Clemon, that being
> . . . .
>
> MR. PERKINS: Wright versus Circuit City— Wright versus South Central
> Bell.
>
> THE COURT: That being Wright versus South Central Bell, Civil Action

---

[18] Tr. 19-20.

Number CV-93-1530.  Now, I represent to you that, in fact, was handwritten in Section VIII on the civil cover sheet filed with the present case.  Did that have any effect upon the assignment of this case?

THE WITNESS:  No, sir.

THE COURT:  Why not?

THE WITNESS:  When that section is filled in for a related case, the intake clerk who makes the initial assignment takes no notice of that at all.  That information is provided for the judicial officer.  And we make a random assignment of the case, regardless of whether there's information there about a previously filed case that may or may not be related to it.

The judicial officer can review that, and his or her law clerk generally calls it to the Court's attention.  And then on the Court's own motion, or on the motion of the parties, the case can be reassigned to the judge who has the older filed case.  But the clerk does not have any discretion about making a direct assignment to that judicial officer based on that.

[There are] only two kinds of cases where the clerk has direction from the court to make a direct assignment to a judicial officer, and that's in the case that has been previously removed and remanded by the judicial officer.  If it comes back to our court on a second removal, it's directly assigned to that judicial officer.  And on a bankruptcy appeal, or a withdrawal from bankruptcy, if a judicial officer has reviewed the underlying bankruptcy action, we directly assign that to the judge.  But in all other instances, it's a random assignment without regard to any indication in that section on the JS-44.[19]

In sum, plaintiffs' reasons for referencing CV-93-C-1530-S as "related" — *e.g.,* the present action focuses upon a "later generation" of the tests addressed in the pending case — are plausible; and, the reference had no effect upon assignment of the present action.[20]

## B.      The Veracity of Representations Made by Mr. Price

Plaintiffs interpreted some statements made by Mr. Price during the July 26, 2002 hearing

---

[19] Tr. 68-70.

[20] *See also, e.g., McCuin v. Texas Power & Light Co.,* 714 F.2d 1255, 1258 n.2 (5th Cir. 1983) ("The fact that the plaintiffs may well be guilty of forum shopping themselves, in filing their lawsuit in the Sherman Division to guarantee that Judge Justice would preside, offers no support to the Defendant in the present matter.") (quoting *McCuin,* 538 F. Supp. 311, 314 (E.D. Tex. 1982)).

-8-

as representing that "one of the reasons he was retained by BellSouth in this case was because of his involvement in the defense of several of the *named plaintiffs'* EEOC charges."[21]  A close reading of the transcript of the July 26th hearing does not clearly establish that Mr. Price made the representation impugned by plaintiffs.  Specifically, Mr. Price stated:

> In September, I was retained to defend some EEOC charges — an EEOC charge, and it was filed by Bobby Parks, *who is one of the putative class members in the Jenkins case*.  Then during September to October, I was retained to defend BellSouth on *six EEOC pattern and practice race discrimination EEOC charges*.  The Jenkins lawsuit was filed on April 29, 2002. *These EEOC charges*, Your Honor, *are still pending that I was working on.*
>
> I entered an appearance on May 10, 2002, on behalf of BellSouth, a current client for whom I was working on matters, Your Honor, at that time, for whom I had represented in cases involving ERISA, sex discrimination, age discrimination.  *I subsequently was retained to defend the EEOC charges*, Your Honor, *which the plaintiffs filed* shortly before or after — I can't remember the exact date right now — *but shortly before or after they filed a lawsuit.*[22]

In any event, in refutation of their interpretation of Mr. Price's remarks, plaintiffs submitted the affidavit of Charles E. Guerrier, Regional Attorney for the Birmingham District Office of the Equal Employment Opportunity Commission since January 2001.  Mr. Guerrier averred that his review of the EEOC's investigative files associated with the charges filed by *named plaintiffs* Denise LeVert and Gladys Jenkins — the only such charges filed in the Birmingham District Office — revealed that neither the "name of Terry Price [nor] that of the law firm of Lehr, Middlebrooks, Price & Proctor . . . appear[s] in either of these files, either as counsel for BellSouth or in any other capacity."[23]

---

[21] Doc. no. 41 (Plaintiffs' Supplemental Brief on Evidence Produced at the July 26, 2002 Hearing), at 7 (emphasis supplied).

[22] Tr. 42 (emphasis supplied).

[23] *Id.*, Exhibit C (Guerrier Affidavit) ¶ 5.

In response, Mr. Price filed a declaration stating that he was "assisting BellSouth Corporation with its defense of numerous EEOC Charges of Discrimination including EEOC Charge Nos. 130 A0 2335 (Denise Levert) and 130 A0 2337 (Gladys Jenkins). Ms. Levert and Ms. Jenkins are named plaintiffs and putative class representatives . . . ."[24]  Mr. Price documented this fact by attaching a letter addressed to him from Glenda Bryan Brooks, who is an investigator employed by the EEOC, dated May 31, 2002, in reference to the charges of discrimination filed by plaintiffs Levert and Jenkins.[25]

Plaintiffs filed a "Second Affidavit of Charles E. Guerrier" on August 8, 2002.  Guerrier acknowledged that the file materials reviewed by him — and on which he had based his statements that it did not appear that Mr. Price or Lehr Middlebrooks represented BellSouth with respect to plaintiffs' charges of discrimination — were incomplete.[26]  He stated that he obtained from Ms. Brooks all documents relating to charges filed by plaintiffs Levert and Jenkins.  Mr. Guerrier further averred that those documents included a letter from Mr. Price dated May 16, 2002, in which Price indicated that he had been "asked to assist" BellSouth in connection with a charge of discrimination filed by Beth Moon.  Guerrier stated that Mr. Price's letter also referred to charges of discrimination filed by Levert and Jenkins.  Accordingly, Guerrier concluded:  "From my review of these documents, the name of Mr. Terry Price or that of the law firm of Lehr Middlebrooks Price & Proctor appears in correspondence related to both the [sic] Denise Levert and Gladys Jenkins as counsel for BellSouth beginning on May 16, 2002."[27]

---

[24] Doc. no. 44 (Declaration of Terry Price) ¶ 2.

[25] *Id.*, Exhibit A.

[26] Doc. no. 45 (Plaintiffs' Motion to File and Notice of Second Affidavit of Charles E. Guerrier) ¶ 3.

[27] *Id.* ¶ 5.

-10-

No further discussion of this issue appears necessary.

For the foregoing reasons, therefore, this court lays the preceding issues aside, and proceeds to an analysis of more substantive contentions.

### III. HISTORICAL BACKGROUND

**A.    Terry Price**

Mr. Terry Price is a native of Fairfield, Alabama.  He is forty-eight years of age (date of birth October 13, 1953).  His undergraduate degree is from Columbia University (B.A. 1975), and his legal education was obtained from the University of California at Davis (J.D. 1978), where he was a member of the Honors Moot Court Team, the Law Review (1977-78), and clerk for a California Superior Court Judge.[28]  He has been admitted to the Bars of the States of Alabama (1979), California (1978), and Georgia (1985), the District of Columbia (1980), and the following courts: the United States District Courts for the Northern, Middle, and Southern Districts of Alabama, the Northern District of California, the Northern, Middle, and Southern Districts of Georgia, and the Eastern District of Wisconsin; the United States Courts of Appeals for the Fifth, Sixth, and Eleventh Circuits; and, the United States Supreme Court.[29]

During the first six years following Mr. Price's graduation from law school, he was an attorney in the Office of the Solicitor of the United States Department of Labor.

> There he represented the federal government in investigations and litigation involving employee benefits, minimum wages, overtime, child labor, government contract labor standards, occupational safety and health, mine safety and health, black lung disability, equal employment opportunity and affirmative action, fraud in

---

[28] *See* doc. no. 11 (Defendant's Memorandum of Law in Opposition to Plaintiffs' Motion to Disqualify), Exhibit A (Price Decl.) ¶ 3.

[29] *See* Biographical profile for Terry Price located on the Web site for Lehr Middlebrooks Price & Proctor (http://www.lmpp.com/Html/bio_price), a copy of which was admitted during the July 26, 2002 hearing as "Defendant's Exhibit 3" ; *see also* I MARTINDALE-HUBBELL LAW DIRECTORY AL117B (2001).

employment and training programs, whistle blower protections, migrant and seasonable [sic] farm workers, the regulation of labor unions, and veterans reemployment rights.[30]

During that period, Mr. Price "was the principal contact within the U.S. Department of Labor for the local office of the OFCCP [Office of Federal Contract Compliance Programs], which at the time had jurisdiction over Alabama, Mississippi, and the panhandle of Florida."[31]  In that capacity, and during the course of investigating federal contractors, Mr. Price gained experience in the application of the *Uniform Guidelines on Employee Selection Procedures*,[32] which represent a joint statement of the Equal Employment Opportunity Commission, the Civil Service Commission, the Department of Labor, and the Department of Justice as to the characteristics of acceptable selection procedures.[33]

Mr. Price joined the Atlanta, Georgia office of the Constangy, Brooks & Smith law firm in 1984, where he eventually rose to the rank of partner.  Since "approximately April of 1996," Mr. Price has been a shareholder in the Birmingham, Alabama law firm of Lehr Middlebrooks Price & Proctor, P.C.[34]

During the period Mr. Price practiced in the Constangy firm's Atlanta office, he founded its "employee benefits department,"[35] and acquired considerable expertise as an attorney familiar with the requirements of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*. His "twenty years of experience in this area includes all aspects of employee benefits,

---

[30] Defendant's Exhibit 3 to July 26, 2002 hearing; *see also* Tr. 21-24; http://www.lmpp.com/Html/bio_price.

[31] Tr. 24.

[32] *Id*. 24-25.

[33] *See supra* note 5.

[34] Doc. no. 11 (Defendant's Memorandum of Law in Opposition to Plaintiffs' Motion to Disqualify), Exhibit A (Price Decl.) ¶ 2.

[35] Tr. 21-23.

from plan drafting through plan administration, assisting employers to comply with the ever-

expanding scope of federal legislative and regulatory initiatives in the benefits field and defending

employee benefit litigation."[36]

> Since leaving the Department of Labor in 1984, [Mr. Price] has devoted his
> practice to representing local, regional and national employers in individual and class
> action civil rights, employment and labor cases, and in the development and day-to-
> day management of EEO, employee benefits, safety and health, and management
> training programs.  Terry is frequently a speaker on employment and employee
> benefits topics and is adept at developing and using multi-media training aids.
>
> Terry also counsels clients on the implications of changes to employee
> benefits.  In addition to acting as counsel on due diligence issues, he has counseled
> these clients on issues involving multi-employer pension plan withdrawal liability;
> severance and parachute arrangements; retiree insurance benefits; catastrophic
> medical claims management; employee benefits plan creation, modification and
> termination; and regulatory audits and compliance matters such as benefits-related
> excise tax exposure, and compliance with governmental reporting and participant
> disclosure rules.[37]

The foregoing biographical profile, although sketched in broad strokes, shows clearly that

Mr. Price is a competent and able attorney.  Nevertheless, plaintiffs are correct when they assert that

the stratagem of retaining Terry Price or the law firms with which he has practiced as a means of

forcing Chief Judge Clemon's recusal "has a long and unfortunate history in this district, which has

been noted by federal judges in Birmingham, on the Court of Appeals for the Eleventh Circuit, and

by Judge Clemon himself."[38]

---

[36] Biographical profile for Terry Price posted on June 13, 2002, on the "worklaw network" Web site (http://www.worklawnetwork.com/lehrmidd.html); *see also* doc. no. 17 (Plaintiffs' Brief in Support of Motion to Disqualify), Exhibit 3 (same). According to Mr. Price, the so-called "worklaw network" is "a loose coalition" of "management labor employment law firms" which "refer cases to each other." Tr. 31. "None of the members can have offices in more than one state," and Lehr Middlebrooks is "the worklaw representative[] for the State of Alabama." *Id.* The information posted on the worklaw network Web site "comes from our firm." *Id.* 23.

[37] Defendant's Exhibit 3 to July 26, 2002 hearing; *see also* Tr. at 21-24; http://www.lmpp.com/Html/bio_price.

[38] Doc. no. 5 (Plaintiffs' Motion to Disqualify), at 2 (citations omitted).

-13-

**B.**    *Crowder v. BellSouth Telecommunications*

Judge William M. Acker, Jr., was the first member of this court to probe that history, in the

case styled *Sandra Crowder v. BellSouth Telecommunications, Inc., et al.*, Civil Action No. 95-AR-

1270-S.  That suit was filed on May 19, 1995, and initially assigned to Judge Clemon.  The plaintiff

sought a temporary restraining order ("TRO"), preliminary injunction, and permanent injunctive

relief based upon BellSouth's alleged "purposeful interference" with her entitlement to disability

rights under an ERISA plan. *See* 29 U.S.C. § 1140.[39]  Following an evidentiary hearing on May 22,

1995, Judge Clemon announced from the bench that plaintiff's motion for TRO would be granted,

conditioned upon the plaintiff posting bond, and that evidence concerning her application for

preliminary injunctive relief would be heard during the latter part of the week beginning May 29,

1995.  BellSouth was represented at that hearing by in-house counsel, Steven T. Stine.[40]  A written

TRO was entered by Judge Clemon the following day, May 23, 1995.[41]  The day after that, Carol Sue

Nelson of the Birmingham office of Constangy, Brooks & Smith filed an appearance as counsel for

---

[39] 29 U.S.C. § 1140 provides, in part, that: "It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary . . . for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan, this subchapter, and the Welfare and Pension Plans Disclosure Act. . . ."

[40] *See* Civil Docket Sheet for Case No. 95-CV-1270, recording the following entries:

| | |
|---|---|
| 5/22/95 — | COURTROOM NOTES: HEARING (TRO) held before the Honorable U.W. Clemon, USDJ.  Court advised preliminary injunction hearing to take place the latter part of the week of 5/29/95.  TRO is GRANTED.  Plaintiff to post $10,000 bond.  Written order to follow.  TD, Ct Rptr (es) |
| 5/22/95 — | NOTICE OF appearance in open court 5/22/95 at TRO hearing by Steven T Stine filed (sh) [Entry date 05/23/95] |

Mr. Stine's address was listed on the first page of the foregoing docket sheet as "BELLSOUTH TELECOMMUNICATIONS INC., 3196 Highway 280 South, Room 304N, Birmingham, AL 35243."

[41] *Id.*, doc. no. 5.

BellSouth.[42]  Of course, Terry Price then was a member of that firm's Atlanta, Georgia office. Judge Clemon accordingly recused himself from further participation in the case,[43] and the action was reassigned by the Clerk to Judge Acker.

BellSouth then asked for a continuance of the preliminary injunction hearing,[44] and that motion was heard by Judge Acker on June 1, 1995.  During that hearing Judge Acker advised the parties that he had ordered the Clerk to provide a report of "all cases filed in this court from January 1, 1993, until the [date of his order], which cases were initially assigned to Hon. U.W. Clemon and in which any attorney with the firm of Constangy, Brooks and Smith thereafter appeared for a defendant, causing Judge Clemon's recusal and a reassignment of the case to another judge of the court."  *Crowder v. BellSouth Telecommunications, Inc., et al.,* Civil Action No. 95-AR-1270-S (N.D. Ala. June 2, 1995), *reprinted in Robinson v. Boeing Co.,* 79 F.3d 1053, 1056 app. (11th Cir. 1996).

The Clerk's report listed fifteen cases, originally assigned to Judge Clemon, that had been reassigned to other judges as a result of the appearance of the Constangy law firm on behalf of a defendant.  *See Robinson,* 79 F.3d at 1056.  Twelve of those fifteen cases (80%) were employment discrimination claims.  Judge Acker observed that he had

> no way of knowing what the incidence of Constangy, Brook [sic] and Smith's being retained by defendants would have been if the above-named cases had been originally assigned to judges other than Judge Clemon, *but an intelligent guess is that the incidence would have been less.*  What, if anything, this court should do about the matter will be for the entire court and not for one judge.  Meanwhile, the defendant in this case is represented by competent counsel and shall file its answer (which may

---

[42] *Id.,* doc. no. 6.

[43] *See* Civil Docket Sheet for Case No. 95-CV-1270, doc. no. 7 (order reading simply: "The undersigned recuses himself from further participation in the above-styled cause as required by 28 U.S.C. § 455(b)(5).").

[44] *Id.,* doc. no. 8.

include a motion to dismiss) by 4:30 P.M., June 12, 1995.

*Id.* at 1056-57 (emphasis supplied).

**C.** ***Carroll v. BellSouth Telecommunications***

The original complaint in *Carroll* was filed on February 28, 1996, by Lois B. Carroll, who claimed that she had been denied promotional opportunities by BellSouth because of her sex, in violation of Title VII of the Civil Rights Act of 1964. The case was assigned to Judge Clemon. On March 14, 1996, an amended complaint was filed, adding Beth Meredith as an individual plaintiff, and, class action allegations. Plaintiffs also simultaneously filed a motion seeking a preliminary injunction. The following day, a notice of appearance was filed, stating simply: "The undersigned counsel hereby enter an appearance on behalf of defendants." The notice was signed by Chris Mitchell of the Birmingham office of Constangy, Brooks & Smith, who also signed the notice of behalf of Terry Price. On March 18th, Judge Clemon entered an order of recusal, and the case was reassigned to then-Chief Judge Sam C. Pointer, Jr.

**D.** ***Robinson v. Boeing Company***

The *Robinson* case was commenced during August of 1992 by a single plaintiff, Anita Robinson, who alleged that Boeing had discriminated against her on the basis of her race, and, retaliated against her for bringing charges against the company. The case originally was assigned to Judge Clemon. "As a result of complaint amendments and additional party interventions, the lawsuit evolved over a six-month period to include nine plaintiffs and an alleged class charging race and sex discrimination with respect to all of Boeing's employment practices." *Robinson*, 79 F.3d at 1054. Fifteen months into the suit, Boeing — already represented by two law firms — filed a motion for leave to associate additional counsel from yet another law firm.

-16-

Boeing sought to associate members of the law firm of Constangy, Brooks & Smith as additional trial counsel *cognizant of the fact that Judge Clemon's nephew was associated with the firm and the grant of defendant's motion would most certainly lead to Judge Clemon's recusal* pursuant to 28 U.S.C. § 455(b)(5)(ii) and/or (iii). *See United States v. Kelly*, 888 F.2d 732, 745- 46 (11th Cir. 1989).

Boeing claimed to have based its choice of substitute counsel on the additional attorneys' knowledge of employment-related matters and the vast resources of the firm that would enable it to handle the complexities of this case. Plaintiffs asserted Boeing's true motive was to "judge shop."

*Robinson*, 79 F.3d at 1054 (emphasis supplied).

The motion was assigned by the Clerk to another judge of this court, Robert B. Propst, who

"finessed the argument that defendants were motivated by" a desire to force Judge Clemon's recusal.

*Id.* Judge Propst wrote:

[T]his court has concluded that it should not decide *this* motion by determining the issue of *motive*. The court concludes that the issue in this case should be decided based on the age of the pending action at the time the motion was filed. Either as a matter of law or court discretion, the court concludes that the fact that the case has been pending for fifteen months at the time the motion was filed militates against granting it in the absence of an overriding need for a particular lawyer.

If the issue is truly not one of "judge shopping," the denial of the motion will not adversely affect the defendant. There is no shortage of law firms available to replace the Lanier-Ford law firm. The fact that a case has been pending a considerable period of time lends itself to potential abuse after there has been an opportunity for considering rulings, discussions, etc. of a trial judge. No matter how extensive the discovery may be, the true motive will be elusive, non-objective and not likely truly ascertainable. The discovery issues, especially those involving attorney-client privilege, are complex, and further discovery would not likely result in a confession or "smoking gun." When there has been a passage of fifteen months, the problem is exacerbated. When there has been such a passage of time, the burden to establish the right to join a disqualifying firm is greater. The court concludes that the motion should be denied.

*Id.* at 1054-55 (emphasis in original).

Judge Propst denied Boeing's motion for reconsideration of his ruling, but later amended the

order to include a certification for interlocutory appeal pursuant to 28 U.S.C. § 1292(b).  The

Eleventh Circuit accepted the appeal and affirmed, concluding that "the denial of the motion to add

counsel was within the discretion of the trial court, and that it did not abridge any fundamental right

to counsel of choice."  *Id.* at 1055.  En route to that conclusion, the Court of Appeals observed that

> [t]he deciding judge was obviously concerned, as are other judges of that
> district, about the possibility that in this district the choice of lawyers may sometimes
> be motivated by a desire to disqualify the trial judge to whom the case has been
> randomly assigned, *see* Memorandum Opinion and Order of Judge William M.
> Acker, Jr. in *Crowder v. BellSouth Telecommunications, Inc. et al.*,
> CV95-AR-1270-S, attached as an Appendix hereto.  This potential for manipulation
> or impropriety may be considered, without making specific findings, a difficulty the
> deciding judge reflected upon in his opinion.

*Id.* at 1056.

E.     ***USX Corporation v. TIECO, Inc.***

This was a complicated action initiated by United States Steel, L.L.C. (later reconstituted as

"USX Corporation"), and its subsidiary, Heatherwood Golf Club, Inc., against Fletcher Yeilding and

two corporate entities controlled by him:  TIECO, Inc., and ATOZ Management, Inc.  TIECO was

a vendor of golf course maintenance equipment, light industrial machinery, and irrigation devices.

ATOZ was TIECO's management arm.  USX operated a tractor shop, and Heatherwood operated

a golf course.  Prior to this litigation, USX's tractor shop and Heatherwood's golf course had been

customers of TIECO.  *See United States Steel, LLC v. TIECO, Inc.*, 261 F.3d 1275, 1279-80 & n.1

(11th Cir. 2001).  Plaintiffs' claims against these defendants were based on the civil provisions of

the Racketeer Influenced and Corrupt Organizations Act of 1970 ("RICO"), 18 U.S.C. § 1961 *et seq.*,

and state law (*e.g.*, fraud, breach of contract, commercial bribery, and conspiracy).

> According to the complaint, the defendants devised and implemented a
> scheme to defraud the plaintiffs by submitting false invoices for goods and supplies

-18-

> bought and paid for by the plaintiffs but never delivered to them.  The defendants
> allegedly gave kickbacks to certain employees of plaintiffs who participated in the
> fraudulent scheme.

*USX Corp. v. TIECO, Inc.*, 929 F. Supp. 1455, 1456 (N.D. Ala. 1996) (Clemon, J.).

The action was filed on December 15, 1995, and assigned to Judge Clemon.  Six months into

the litigation, defendants filed a counterclaim against plaintiffs,[45] and, a motion seeking permission

to add the Attorney General of the State of Alabama and two investigators in the Attorney General's

office as counterclaim defendants.[46]  The counterclaim alleged civil rights violations and conspiracy

under 42 U.S.C. §§ 1983 and 1985, violations of Alabama Code § 36-25-8 (1975) (regarding non-

disclosure of confidential information gained by a public official by reason of his position),[47] tortious

interference with business relationships, conspiracy, conversion, negligence, and wantonness.  *See*

*USX Corp.*, 929 F. Supp. at 1456-57.

Judge Clemon's nephew, Terry Price — who, during April of 1996, had severed his

relationship with the Constangy firm and joined his present firm — and another shareholder in the

---

[45] *See* Civil Docket Sheet for Case No. 95-CV-3237, doc. no. 38 (answer and counterclaim filed June 4, 1996).

[46] *Id.*, doc. no. 40 (motion to add parties as counterclaim-defendants filed June 4, 1996).

[47] As Judge Clemon observed in a memorandum opinion entered on June 21, 1996, two investigators in the office of the Attorney General of the State of Alabama (Chief Investigator Edward F. McFadden and Investigator Larry Miller) sought and obtained from a state court on August 30, 1995, a search warrant for the seizure of the business records of TIECO and ATOZ.

> The affidavit for the search warrant was based principally on information provided by Mr. Colby [a former TIECO employee who had worked on the USX account, but who, on the date he supplied the affidavit, was employed by a competitor of TIECO].  The search warrant was executed on the following day.
>
> The seizure by the AG's office included virtually all of the business records of these two defendants, as well as some of the records of another corporation, House of Threads, Inc.
>
> *Some of the records seized by the AG's office were later turned over to USX.  After USX received these records, it filed this lawsuit in December 1995.*

*USX Corp. v. TIECO, Inc.*, 929 F. Supp. 1455, 1457-58 (N.D. Ala. 1996) (emphasis supplied).

Lehr Middlebrooks firm, R. David Proctor, appeared as counsel for the counterclaim defendants.[48]

Defendants/counterclaim-plaintiffs filed a "Motion for Hearing Concerning Representation of

Counterclaim Defendants Pursuant to Robinson v. Boeing,"[49] asserting that such representation was

designed solely for the purpose of forcing Judge Clemon to recuse himself:

> 1. On Thursday, June 13, 1996, counsel for Defendants, J. Mark White, was
> in Montgomery, Alabama, most of the business day and on Thursday afternoon
> returned phone messages via car phone. Counsel returned a call from Terry Price
> ("Price") who advised he intended to enter an appearance in the instant case [CV-95-
> C-3237-S] and represent the Attorney General and the two employees of the Attorney
> General's office. In the course of the conversation, Price indicated he was the
> nephew of the Honorable U.W. Clemon, the presiding judge. Counsel indicated to
> Mr. Price if he intended to appear in this matter and raise an issue of conflict
> regarding Judge Clemon, the Defendants were prepared to waive any conflict.

> 2. Late that afternoon, counsel for Defendants returned to his office and
> received a second message from Mr. Price who advised the statute would not permit
> a waiver and therefore, Judge Clemon would not be able to keep the case once Price
> entered an appearance. Price indicated he would not enter an appearance until such
> time as the motion to add the Attorney General and the two employees as parties was
> granted, but he did intend to attend the hearing on June 18, 1996 at 10:30 AM.[50]
> Counsel for Defendant advised Mr. Price there was a substantial problem with his
> appearance as counsel and that the issue would have to be litigated as to whether or
> not he had been retained merely for the purpose of disqualifying the trial judge.

> 3. The Federal Courthouse had already closed when counsel for defendant
> returned to his office on Thursday, June 13, 1996. The Courthouse was closed due
> to the City Stages Festival on June 14, 1996. This motion is therefore being filed
> Monday, June 17, 1996. Counsel for Defendant believes, based upon the disclosures
> made in the telephone conversation, there is an ethical obligation for counsel for
> Defendant to disclose to the court the communication from Mr. Price.

> 4. Counsel for Defendant is aware of Mr. Price's prior association with the

---

[48] *See* Civil Docket Sheet for Case No. 95-CV-3237, doc. no. 49 (notice of appearance filed June 20, 1996).

[49] *See id.*, doc. no. 45 (filed June 17, 1996). *Nota bene* that this motion actually was filed prior to formal entry of appearance by Terry Price and his new firm, based upon the events described in the text following this footnote.

[50] *See id.*, doc. no. 44 (order entered June 11, 1996, continuing the hearing on all pending motions to June 18, 1996, at 10:30 a.m.). Judge Clemon granted the motion to add the Alabama Attorney General and his two investigators as counterclaim defendants during the course of the June 18, 1996 hearing.

firm of Costagy [sic], Brooks & Smith and is aware that firm specializes in labor relations, equal employment, employee benefits, OSHA and environmental law.

5. Counsel for Defendant has examined the Martindale-Hubbell listing for Mr. Price's present firm, Lehr, Middlebrooks, Price & Proctor, P.C. In Martindale-Hubbell, 1996 Edition, that firm lists specialities similar or identical to Mr. Price's prior firm.

6. Upon information and belief Defendants are unaware if counsel entering the appearance has ever represented any of the individual defendants in their official or individual capacity or if he has ever represented the State of Alabama.

7. Upon information and belief Defendants do not believe purported counsel for the individual cross-claim defendants has defended § 1983 and § 1985 civil rights actions. His primary area of expertise is ERISA.

8. Counsel for Defendants would show the State of Alabama has many in-house attorneys as well as a list of approved attorneys to represent the State of Alabama in civil matters.

9. Counsel for Defendants would show the State of Alabama, on frequent occasions, has been called upon to defend § 1983 and § 1985 actions and has existing relationships both with counsel within the Attorney General's office and outside counsel who can provide representation to these parties.

WHEREFORE, PREMISES CONSIDERED, Defendants' counsel requests this Court to transfer the issue of representation by purported counsel to the Chief Judge for consideration and resolution pursuant to *Robinson v. Boeing*.[51]

Judge Clemon construed the motion as raising "the pregnant question of whether the disqualification of this judge was a motivating factor in the decision of counterclaim defendant Attorney General Jeff Sessions and his Chief Investigator to hire [his nephew's] law firm," *USX Corp. v. TIECO, Inc.*, 929 F. Supp. 1460, 1461 (N.D. Ala. 1996), and entered an order reading, in part, as follows:

Section 455(b)(5)(ii) of the United States Judicial Code (Title 28) requires a judge to disqualify himself if a person within the third degree of relationship to him

---

[51] *Id.*, doc. no. 45 ("Motion for Hearing Concerning Representation of Counterclaim Defendants Pursuant to Robinson v. Boeing"), at 1-4.

is acting as a lawyer in the proceeding.  Terry Price, being the middle son of the oldest sister of this judge, falls into that category.

As the Fifth Circuit has observed and held:

".... If after seeing who the judge is or weighing his rulings for a period of years, a litigant could in effect veto the [assignment] and obtain a new judge by the simple expedient of finding one of the judge's relatives who is willing to act as counsel, it would become possible for any party to disrupt preparation for, or, indeed, the trial itself.

The drafters of § 455 warned that 'each judge must be alert to avoid the possibility that those who would seek his disqualification are in fact seeking to avoid the consequences of his expected adverse decision. [footnote omitted].  In light of Congress' intent and the needs of judicial efficiency, we hold that counsel may not be chosen solely or primarily for the purpose of disqualifying the judge. The district court threatened with such maneuvers need not confine itself to grievance proceedings against errant counsel.  'A motion to disqualify counsel is a proper method for a party-litigant to bring the issue of conflict of interest or a breach of ethical duties to the attention of the court.'  [footnote omitted].  Indeed, 'a District court is obliged to take measures against unethical conduct occurring in connection with any proceeding before it.'"  *Woods v. Covington County Bank*, 537 F.2d 804, 810 (5th Cir. 1976).

*McCuin v. Texas Power & Light Co.*, 714 F.2d 1255, 1264 (5th Cir.1983) (emphasis added).

Since this judge is automatically precluded from hearing the Motion to Disqualify the law firm chosen by the Attorney General and his Chief Investigator, consistent with *Robinson v. Boeing*, 79 F.3d 1053 (11th Cir.1996), the motion is hereby referred to the Clerk of this Court for reassignment to another judge of the Court consistent with the routine practices of the Court. In the meanwhile, this judge shall proceed no further.

*USX Corp.*, 929 F. Supp. at 1461.[52]

The motion to disqualify initially was assigned by the Clerk to Judge Edwin L. Nelson of this

---

[52] In one of the omitted footnotes, Judge Clemon observed that "The moving defendants request that this Court transfer the 'motion ... for consideration by the Chief Judge of the Northern District of Alabama....." Motion, p. 1.  This court lacks the power to do so.  *McCuin*, p. 126."  *USX Corp. v. TIECO, Inc.*, 929 F. Supp. 1460, 1461 n.2 (N.D. Ala. 1996).

court. "Upon due consideration," however, Judge Nelson "recuse[d] himself from participation in this matter."[53] The Clerk then reassigned the motion to the present judicial officer,[54] who conducted a chambers conference on July 15, 1996, and thereafter entered an order requiring the parties to submit briefs, and, setting a date for an evidentiary hearing.[55] The issue was mooted on July 18, 1996, however, when defendants voluntarily dismissed their counterclaims against the Alabama Attorney General and his two investigators.[56]

**F.     July 15, 1996 Standing Order**

In the wake of *Crowder v. BellSouth*, *Carroll v. BellSouth*, *Robinson v. Boeing*, and, on the same date this court conferred with counsel in *USX Corp. v. TIECO*, then-Chief Judge Sam C. Pointer, Jr. entered the following "Standing Order":

> Effective July 15, 1996, the appearance in any civil case pending in this court by any counsel in addition to, or in substitution of, a previously-appearing counsel for the same party shall, if such appearance would or might constitute grounds for recusal or disqualification of the judge to whom the case is assigned (which did not already exist by reason of the identity of the previously-appearing counsel), be ineffective until such time that a motion, seeking leave to add or substitute such new counsel, is approved by a district judge or magistrate judge of this court. Ordinarily, such a motion shall be referred automatically and at random to a magistrate judge of this court for prompt hearing and decision. *There shall be a strong, but rebuttable, presumption that the reason for such a proposed addition or substitution of counsel is to cause recusal or disqualification of the assigned judge*; and the judge to whom such motion is referred may also consider the disruptive effect, if any, reassignment of the case to another judge would have upon the court and other parties. [Emphasis

---

[53] Civil Docket Sheet for Case No. 95-CV-3237, doc. no. 55 (order of recusal entered June 25, 1996).

[54] *See* Civil Docket Sheet for Case No. 95-CV-3237:

6/25/96 —     MOTION referral (utility event) referring to Judge C L Smith Jr the motion for hearing concerning representation of counter-claim dfts pursuant to Robinson v. Boeing Co [45-1] (cvos)

[55] *Id.*, doc. no. 67 (order entered July 15, 1996).

[56] *See id.*, doc. no. 70 (notice of voluntary dismissal pursuant to Rules 41(a) and 41(c), Fed. R. Civ. P.); *see also* doc. no. 72 (order entered July 26, 1996, dismissing counterclaims without prejudice, and, directing clerk to reassign the case to Judge Clemon).

supplied.]

**G.** *Wright v. Circuit City Stores*

In a declaration appended to BellSouth's original brief in opposition to plaintiffs' motion to disqualify the Lehr Middlebrooks firm, Mr. Price asserts that his prior experience in two class actions buttressed his qualifications to represent BellSouth in the present controversy.[57] One of those cases is *Carroll v. BellSouth*, discussed in § III.C *supra*, and the other is the subject of this section, *Wright v. Circuit City Stores*. That case was filed by Reginald Wright on March 28, 1997. He alleged that he had been subjected to disparate treatment on the basis of his race, African American, in violation of 42 U.S.C. §§ 1981 and 1985(3). The case was assigned to Judge Clemon. The complaint was amended on July 27, 1997, to add five plaintiffs, and, class allegations. Circuit City originally was represented by Thomas Coleman, Jr., of the Birmingham firm, Smith, Spires & Peddy, P.C. Mr. Coleman filed an answer to the *original* complaint on July 31, 1997.

On September 10, 1997, however, Circuit City filed an answer to the *amended* complaint, as well as a notice stating that Jere F. White, Jr., and William H. King, III, of the Birmingham law firm Lightfoot, Franklin & White, L.L.C. ("Lightfoot Franklin"), would thereafter serve as counsel for defendant, in place of Mr. Coleman. On September 18, 1997, Anne Sikes Hornsby of the Lightfoot Franklin firm also filed a notice of appearance in the case.

---

[57] *See* doc. no. 11 (Defendant's Memorandum of Law in Opposition to Plaintiffs' Motion to Disqualify), Exhibit A (Price Decl.), ¶¶ 5 and 6, reading as follows:

> 5. I had substantial involvement in the representation of BellSouth in a putative class action involving claims of sex and age discrimination filed against BellSouth, in *Carroll, et al. v. BellSouth Telecommunications, Inc.*, through its dismissal.

> 6. I have had experience defending cases brought by Gordon Silberman, Wiggins & Childs, one of the law firms that has brought this action. One such case is *Wright v. Circuit City Stores*, a case in which Gordon Silberman, Wiggins & Childs represented the plaintiffs.

On October 27, 1997, Circuit City filed a "Motion to Stay Proceedings and Compel Arbitration." The motion was set for argument on Judge Clemon's November 21, 1997 docket, but various continuances were granted to both sides, and the motion was not addressed until March 6, 1998. The attorneys orally argued the motion during a one-hour hearing, but presented no testimony. Judge Clemon then took the motion under advisement, and there was no activity in the case (except for some limited discovery and the entry of an agreed-upon "Stipulated Protective Order") until September 30, 1998, when Terry Price and Brent L. Crumpton of the Lehr Middlebrooks firm filed a "Motion for Leave to Substitute Counsel" on behalf of Circuit City. The Lightfoot Franklin firm filed a motion to withdraw as counsel for Circuit City on October 2, 1998. David Middlebrooks filed a "Motion to Join Motion for Leave to Substitute Counsel" on October 7, 1998. The action then was reassigned by the Clerk to Magistrate Judge John E. Ott, for resolution of the motions to substitute counsel.

Following two hearings and the submission of briefs, Judge Ott entered a lengthy memorandum opinion and order on November 23, 1998, denying Circuit City's motion to substitute counsel. Among other findings of fact, Judge Ott recorded that: (1) during a September 22, 1998 telephone conversation, David Middlebrooks informed Circuit City's Associate General Counsel, Pamela Parsons, that an attorney in his firm was a relative of Judge Clemon;[58] (2) during a September 28, 1998 flight to Birmingham, for the purpose of interviewing attorneys in several firms being considered by Circuit City as new counsel for the company, Ms. Parsons informed Stephen Cannon, Circuit City's Senior Vice President and General Counsel, that an attorney at Lehr

---

[58] *Wright v. Circuit City Stores*, CV-97-C-0776-S, mem. op. at 5 (N.D. Ala. Nov. 23, 1998) (Ott, M.J.).

Middlebrooks was related to Judge Clemon;[59] and (3) during a meeting held at Lehr Middlebrooks

later that same day, attended by Ms. Parsons, Mr. Cannon, and David Nagle on behalf of Circuit

City,[60] and, Terry Price and David Middlebrooks on behalf of the Lehr Middlebrooks firm,

> Circuit City's counsel specifically were informed that Terry Price was Judge
> Clemon's nephew and "that in other cases he had been involved in . . . that it was
> necessary for the judge to recuse himself because of Mr. Price's involvement in the
> case." (Doct. 29, p. 72). They were also told of the court's standing order
> concerning the necessity of filing a motion to substitute counsel when the addition
> or substitution of counsel would require recusal or disqualification of a judge to
> whom the case is assigned and the Eleventh Circuit Court of Appeals decision in
> *Robinson v. Boeing*, 79 F.3d 1053 (11th Cir. 1996), addressing the substitution of
> counsel issue. Parsons was provided with a copy of the standing order and the
> Boeing case before she left the meeting. *Id.*
>
> After the meeting at Lehr Middlebrooks, Circuit City's counsel also talked
> with James Alexander at Bradley Arant and William Gardner at Cabaniss Johnston.
> (Doct. 29, pp. 75-76). Counsel flew out of Birmingham the same day. Parsons made
> the decision to retain Lehr Middlebrooks on the flight back to Virginia before reading
> the *Boeing* decision. (Doct. 29, pp. 40, 77).[61]

Based upon such evidence, Judge Ott found that corporate counsel for Circuit City "was

clearly aware or should have been aware of the consequences presented by the prospect of hiring the

Lehr Middlebrooks firm," and concluded: "This court cannot fathom that, under these

circumstances, the disqualification of Judge Clemon was not a variable in Ms. Parsons' mind."[62]

Circuit City sought review of Judge Ott's decision by an Article III judge, and the case was

referred by the Clerk to Judge Edwin L. Nelson on December 8, 1998. Judge Nelson did not address

the issue until November 10th of the following year when, in a short order, he overruled Judge Ott's

---

[59] *Id.*

[60] David Nagle of the LeClair Ryan law firm in Richmond, Virginia, then was representing Circuit City in other employment-related matters having a bearing on the *Wright* case. *Id.*

[61] *Id.* at 5-6.

[62] *Id.* at 19.

decision, and entered an order granting Circuit City's motion to substitute Terry Price and the Lehr Middlebrooks firm as counsel for defendant. Judge Nelson also directed the Clerk to randomly select a new judge, and — following an intervening flurry of pleadings related to plaintiffs' motion for reconsideration, which was denied — the case was reassigned to Senior Judge Sam C. Pointer, Jr. Following Senior Judge Pointer's resignation, the case was inherited by Judge Sharon L. Blackburn, who carried it to conclusion.

## IV. GUIDING LEGAL PRINCIPLES

The Sixth Amendment to the United States Constitution provides that, "[i]n all *criminal prosecutions*, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI (emphasis supplied). There is no corresponding constitutional provision explicitly guaranteeing a *civil litigant's* right to representation by counsel. Even so, the Supreme Court has indicated in decisions discussing the Sixth Amendment that a civil litigant's right to counsel is implicit in the Fifth Amendment's due process clause.[63] *See, e. g., Powell v. Alabama*, 287 U.S. 45, 69, 53 S.Ct. 55, 77 L.Ed. 158 (1932); *Cooke v. United States*, 267 U.S. 517, 537, 45 S.Ct. 390, 69 L.Ed. 767 (1925). For example, when speaking for the Court in *Powell v. Alabama*, Justice Sutherland said:

> If in any case, *civil or criminal*, a state or federal court were arbitrarily to refuse to hear a party by counsel, employed by and appearing for him, it reasonably may not

---

[63] The Fifth Amendment to the United States Constitution provides:

> No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, *nor be deprived of life, liberty, or property without due process of law*; nor shall private property be taken for public use, without just compensation.

U.S. Const. amend. V (emphasis supplied).

-27-

> be doubted that such a refusal would be a denial of a hearing, and, therefore, of due process in the constitutional sense.

287 U.S. at 69, 53 S.Ct. at 64 (emphasis supplied); *see also Potashnick v. Port City Construction Co.*, 609 F.2d 1101, 1118 (5th Cir. 1980) ("A civil litigant's right to retain counsel is rooted in fifth amendment notions of due process . . .").[64] Thus, the right to representation by counsel in either a criminal prosecution or civil litigation "is one of constitutional dimensions." *Potashnick*, 609 F.2d at 1118.

Nevertheless, a distinction must be drawn between the right to representation *by counsel*, on the one hand, and the right to representation by counsel *of one's choice*, on the other. Discussion of that dichotomy must begin with recognition of the fact that, in criminal prosecutions, an accused has "much more at stake than a civil litigant asserting or contesting a claim for damages"; indeed, the accused faces "the loss of personal liberty," and "for this reason the law affords greater protection to the criminal defendant's rights." *Id.* Among other protections afforded, "the Sixth Amendment requires the courts to respect a defendant's own particular *choice* of counsel." *United States v. Dinitz*, 538 F.2d 1214, 1219 (5th Cir. 1976) (emphasis in original).[65]

---

[64] The *Potashnick* Court observed that the notion of a Fifth Amendment basis for a civil litigant's right to retain counsel developed

> out of the principle that notice and hearing are preliminary steps essential to the passing of an enforceable judgment and that they constitute basic elements of the constitutional requirement of due process of law. *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313, 70 S.Ct. 652, 94 L.Ed. 865 (1950); *Powell v. Alabama*, 287 U.S. 45, 68, 53 S.Ct. 55, 77 L.Ed. 158 (1932). Historically and in practice, the right to a hearing has always included the right to the aid of counsel when desired and provided by the party asserting the right. . . .

*Potashnick v. Port City Const. Co.*, 609 F.2d 1101, 1117-18 (5th Cir. 1980); *see also McCuin v. Texas Power & Light Co.*, 714 F.2d 1255, 1262 (5th Cir. 1983) (observing that "the right to counsel in civil cases . . . springs from both statutory authority and from the constitutional right to due process of law") (footnoted citations omitted).

[65] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

Even so, the deferential requirement of judicial "respect" for a criminal defendant's particular

choice of counsel is not equivalent to an unrestricted power to act at one's own discretion, nor an

unfettered freedom to demand one's preference, as the *Dinitz* Court made clear when observing that

the Sixth Amendment "does *not* afford a defendant the *unqualified* right to counsel of his choice";

rather, "the right to counsel of one's choice is *limited to some extent.*" *Id.* (emphasis supplied).

> There are . . . some limits to the constitutional right to be heard through the counsel of one's choice. *Powell* itself contemplates the existence of such limits when it states that "the right to counsel being conceded, a defendant should be afforded a *fair opportunity* to secure counsel of his own choice." [287 U.S.] at 53, 53 S.Ct. at 58 (emphasis added). There is some point short of allowing a defendant complete freedom in choosing his own counsel at which the Sixth Amendment's prescription is satisfied. To hold otherwise would necessarily condemn, for example, even local bar admission requirements, and no one would seriously maintain that the Sixth Amendment requires that.
>
> To make an informed judgment [courts] must place this qualified right to choose one's own counsel against the backdrop of judicial discretion. Traditionally, courts enjoy broad discretion to determine who shall practice before them and to monitor the conduct of those who do. Since attorneys are officers of the courts before which they appear, such courts are necessarily vested with the authority, within certain limits, to control attorneys' conduct. *See, e. g., Phipps v. Wilson*, 186 F.2d 748 (7th Cir. 1951); ABA Standards Relating to the Administration of Criminal Justice, The Function of the Trial Judge §§ 6.3, 6.5 (1972); *cf. Theard v. United States*, 354 U.S. 278, 77 S.Ct. 1274, 1 L.Ed.2d 1342 (1957); 28 U.S.C. § 1654 (1970). . . . In this connection, of course, the Sixth Amendment is indisputably relevant, for it helps define the limits of judicial discretion. But the Sixth Amendment's right to *choice* of counsel merely informs judicial discretion — it does not displace it. Our inquiry, then, must focus on the trial court's exercise of its discretion. In each case, we must inquire whether, given the defendant's qualified right to choose his own counsel, the trial court's refusal to hear the defendant through his chosen counsel constituted an abuse of discretion. . . .

*Dinitz*, 538 F.2d at 1219 (emphasis in original) (footnotes omitted).

One factor informing the trial court's exercise of deferential discretion is whether a criminal

defendant's choice of counsel is being used for improper purposes. "The freedom to choose one's

counsel may not be used as a device to manipulate or subvert the orderly procedure of the courts or the fair administration of justice." *United States v. Casey*, 480 F.2d 151, 152 (5th Cir. 1973); *see also Dinitz*, 538 F.2d at 1219 n.7 (same); *United States v. Terry*, 449 F.2d 727, 728 (5th Cir. 1971) (same).

It logically follows from the foregoing discussion that, if the right to representation by *counsel of one's choice* is limited even in the context of the Sixth Amendment — which explicitly establishes "an absolute, unqualified right to the representation of counsel" in criminal prosecutions, *Dinitz*, 538 F.2d at 1219 — then that right also is circumscribed in the context of civil litigation. That conclusion is persuasively supported by the Fifth Circuit's decision in *McCuin v. Texas Power & Light Co.*, 714 F.2d 1255 (5th Cir. 1983). After acknowledging that civil litigants "do have a right to be represented *by counsel*," and, that such an entitlement "ordinarily implies a right to *lawyers of their choice*," the *McCuin* Court held, nevertheless, that "[t]he right to counsel does *not . . . entail absolute freedom of choice*." *Id*. at 1262 (emphasis supplied).

> Litigants do have a right to be represented by counsel and this ordinarily implies a right to lawyers of their choice. The right to counsel does not, however, entail absolute freedom of choice. Counsel must be a member of the bar and must be admitted to practice before the court in which he appears. He must not have a conflict of interest with another party. His employment must not entail disclosure of confidential information. *The choice is never completely unfettered.*
>
> Subject to these general limitations, the right to counsel in criminal cases is expressly guaranteed by the sixth amendment; the right to counsel in civil cases is no less fundamental and springs from both statutory authority and from the constitutional right to due process of law. Therefore, disqualification of counsel "is an extreme remedy that will not be imposed lightly." *Duncan v. Merrill Lynch, Pierce, Fenner & Smith*, 646 F.2d 1020, 1025 n.6 (5th Cir.), *cert. denied*, 454 U.S. 895, 102 S.Ct. 394, 70 L.Ed.2d 211 (1981).
>
> *The right to counsel of one's choice may be overridden when "compelling reasons exist."* The right should be balanced in cases in which it is challenged

> against the right to "untainted prosecution of the lawsuit" and society's need to
> maintain the highest ethical standards of professional responsibility. It cannot be
> exercised without thought also to the needs of effective administration of justice.
> "[T]he ultimate decision on [delaying a trial for the appointment of separate counsel]
> must remain with the trial judge; otherwise unscrupulous defense attorneys might
> abuse their 'authority,' presumably for purposes of delay or obstruction of the orderly
> conduct of the trial. . . ." *Holloway v. Arkansas*, 435 U.S. 475, 486-87, 98 S.Ct.
> 1173, 1180, 55 L.Ed.2d 426, 436 (1978) (footnote omitted).

*McCuin*, 714 F.2d at 1262-63 (emphasis supplied) (footnoted citations omitted) (bracketed

alterations in original).

One "compelling reason" for negating a civil litigant's choice of counsel arises when a party

employs counsel for the purpose of forcing the recusal of the judge to whom an action is assigned.

Stated differently, "counsel may not be chosen solely or primarily for the purpose of disqualifying

the judge." *Id*. at 1264.

> If, *after seeing who the judge is* or weighing his rulings for a period of years, a
> litigant could in effect veto the allotment and obtain a new judge by the simple
> expedient of finding one of the judge's relatives who is willing to act as counsel, it
> would become possible for any party to disrupt preparation for, or, indeed, the trial
> itself.
>
>     The drafters of [28 U.S.C.] § 455 warned that "each judge must be alert to
> avoid the possibility that those who would [seek his disqualification] are in fact
> seeking to avoid the consequences of his expected adverse decision." In light of
> Congress' intent and the needs of judicial efficiency, *we hold that counsel may not
> be chosen solely or primarily for the purpose of disqualifying the judge. . . .*

*Id*. (emphasis supplied) (footnote omitted).[66]

For such reasons the *McCuin* Court concluded: "if the district court should find . . . that the

sole or primary motive for retaining the relative of the original judge was to disqualify that judge,

*the lawyer must be disqualified*." *Id*. at 1257 (emphasis supplied).

---

[66] The omitted footnote cites H.R.Rep. No. 1453, 93d Cong., 1st Sess. (1973), at —, *reprinted in* 1974
U.S.C.C.A.N. 6351, 6355, as the source of the quoted statement attributed to the drafters of 28 U.S.C. § 455. *McCuin*,
714 F.2d at 1264 n.30.

That conclusion is supported by a binding decision of the former Fifth Circuit, holding that

"a litigant should not be permitted to utilize a disqualification issue as part of his trial strategy."

*Potashnick*, 609 F.2d at 1115.

The *Potashnick* holding was reiterated by the Eleventh Circuit in *United States v. Kelly*, 888

F.2d 732 (11th Cir. 1989), stating:

> We have held . . . that a recusal issue may not be abused as an element of trial strategy. *Cf.* [*Potashnick*, 609 F.2d at 1115]; *accord Phillips v. Amoco Oil Co.*, 799 F.2d 1464, 1472 (11th Cir. 1986), *cert. denied*, 481 U.S. 1016, 107 S.Ct. 1893, 95 L.Ed.2d 500 (1987) (party may not lie in wait, knowing facts supporting a section 455(a) claim, and raise issue only after court's ruling on merits); *United States v. Slay*, 714 F.2d 1093, 1094 (11th Cir. 1983), *cert. denied*, 464 U.S. 1050, 104 S.Ct. 729, 79 L.Ed.2d 189 (1984) (untimely section 455(a) claim need not be considered on appeal).

*Kelly*, 888 F.2d at 746 (footnote omitted).

## V. DISCUSSION

### A.    Framework for Analysis

This court has struggled to ascertain the appropriate standard by which to decide plaintiffs'

motion to disqualify.  Plaintiffs urge the court to follow the Eleventh Circuit's analysis in *Cox v.*

*American Cast Iron Pipe Company*, 847 F.2d 725 (11th Cir. 1988).  There, the Court of Appeals,

relying on Canon 9 of the American Bar Association Code of Professional Responsibility, reiterated

the two-prong test of *Woods v. Covington County Bank*, 537 F.2d 804, 810 (5th Cir. 1976), that a

lawyer may be disqualified from representing a party if the court finds:  "(1) some specifically

identifiable appearance of improper conduct and (2) that 'the likelihood of public suspicion or

obloquy outweighs the social interest which will be served by a lawyer's continued participation in

a particular case.'"  *Cox*, 847 F.2d at 729 (quoting *Woods*, 537 F.2d at 813 & n.12).

The continued viability of this analysis has been called into question, however, as the American Bar Association deleted the language of Canon 9 of the Model Code of Professional Responsibility from its Model Rules of Professional Conduct.  Additionally, the Alabama Code of Professional Responsibility was replaced during January of 1991 with rules similar to the ABA's Model Rules.[67]  *See Nuri v. PRC, Inc.*, 5 F. Supp. 2d 1299, 1303 (M.D. Ala. 1998).  United States District Judge Myron Thompson observed that "with the language of Canon 9 that focuses on 'even the appearance of impropriety' gone from any set of rules governing an attorney practicing in the Middle District [of Alabama], and no language that is similar, the test based on it seems improper."  *Id.*  Even so, he identified the following guiding principles relevant to consideration of a motion to disqualify counsel:

> Consideration of a motion to disqualify involves a balancing of competing interests, and disqualification is not something that follows mechanically from a finding of a violation [of rules of professional conduct].  Among the many competing interests are maintaining the integrity of the legal community and the legal process, protecting litigants from prejudice caused by violations of the rules, and respecting a person's ability to choose her own counsel.

*Id.* (citations omitted).

While the *Woods/Cox* two-prong test may no longer be viable when determining whether a motion to disqualify should be granted, the principles undergirding the test still have some relevance when 28 U.S.C. § 455 is implicated.

Clearly, the goal of the judicial disqualification statute is to foster the

---

[67]Attorneys who practice in the Northern District of Alabama are

required to be familiar with, and shall be governed by, the Local Rules of this court and, to the extent not inconsistent with the preceding, the Alabama Rules of Professional Conduct adopted by the Alabama Supreme Court and, to the extent not inconsistent with the preceding, the American Bar Association Model Rules of Professional Conduct, except Rule 3.8(f) thereof. . . .

N.D. ALA. L.R. 83.1(f).

> *appearance* of impartiality. This overriding concern with appearances, which also
> pervades the Code of Judicial Conduct and the ABA Code of Professional
> Responsibility, stems from the recognized need for an unimpeachable judicial system
> in which the public has unwavering confidence. As this court has noted, "the
> protection of the judicial process from any hint or appearance of bias is the palladium
> of our judicial system." *United States v. Columbia Broadcasting System, Inc.,* 497
> F.2d 107, 109 (5th Cir. 1974).

*Potashnick*, 609 F.2d at 1111 (footnote omitted). Stated differently, the "appearance of impropriety"

remains a valid concern, even if viewed from a different perspective than that of now-extinct Canon

9.[68]

Additionally, this court finds that the "Standing Order" entered by former Chief Judge

Pointer on July 15, 1996 is relevant to the issue before the court.

BellSouth is correct when asserting that the "Standing Order" applies, by its terms, only to

the circumstance in which new counsel appears "in addition to, or in substitution of, a previously-

appearing counsel for the same party" in a civil action pending in this court.

This court concludes, nonetheless, that the policy underlying that order is more profound than

the surface depth of its language.

To begin with, as noted in § III.F *supra*, the order was entered in the wake of *Crowder v.*

*BellSouth* (and Judge Acker's idenitification of fifteen previous cases in which Judge Clemon's

recusal had been forced by the appearance of his nephew, or his nephew's law firm, as counsel for

a party), *Carroll v. BellSouth* (reassigned to Judge Pointer), *Robinson v. Boeing* (in which both Judge

---

[68] In *McCuin*, discussed *supra* section IV, the Fifth Circuit, citing then-applicable Canon 9, stated that "[a] lawyer should not . . . lend himself to a contrivance by which his services are sought not for his ability but solely because his relationship with a judge enables the litigant who employs him to exercise a *de facto* peremptory challenge to the judge." 714 F.2d at 1264 (footnote omitted). For example, if an attorney who practiced solely in the field of real estate were retained to represent a defendant in a Title VII action, it would be fairly obvious that he was retained "solely because of his relationship with a judge." In this action, however, the issue is not so cut-and-dried. While it is apparent that Price is an able attorney with some experience in the issues raised by plaintiffs' claims, it is less apparent that his relationship with Judge Clemon did not influence BellSouth's decision to retain him.

-34-

Propst and the Eleventh Circuit were forced to address circumstances similar to those raised by *Carroll*), and, on the same day this court was conducting a chambers conference with counsel in *USX Corp. v. TIECO*. Viewed in that context, it cannot be argued reasonably that Judge Pointer was unaware of the long and unfortunate history of recusals forced by the appearance of Terry Price and/or the law firms with which he has been associated.

More fundamentally, however, the standing order implicitly acknowledges that proof of a party's motive or intent is difficult at best; and, accordingly, the order shifts the burden of persuasion to the party whose selection of counsel "would or might constitute grounds for recusal or disqualification of the judge to whom the case is assigned" by means of the creation of "a strong, but rebuttable, presumption" that the reason for the selection of such counsel was "to cause recusal or disqualification of the assigned judge."

This court agrees with the argument of plaintiffs' counsel that they are entitled, by logical extension of the policy considerations undergirding the standing order, to a similar presumption, and that defendant bears the burden of rebutting that presumption.[69]

With all of these considerations in mind, this court will analyze the specific facts of this case, beginning with a discussion of the manner in which BellSouth retained Mr. Price as local counsel.

**B.     The Retention of Terry Price**

On February 1, 2001, the Equal Employment Opportunity Commission, acting pursuant to 42 U.S.C. §§ 2000e-5(f)(1), 2000e-5(f)(3), and 2000e-6, filed an action against BellSouth in the United States District Court for the Southern District of Alabama. The complaint alleged that BellSouth had "engaged in a pattern and practice of discrimination and disparate treatment against

---

[69] *See* Tr. 13-14.

Black employees in the BellSouth Mobile, Alabama, office[,] including failing and refusing to promote Black employees and failing or refusing to allow them to participate in assessment testing and training which affected their privileges of employment" in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*[70] Numerous individual plaintiffs have subsequently intervened in that action.

BellSouth's Chief Counsel for labor and employment litigation matters, Keith W. Kochler, has represented to this court that his company "became concerned" that the EEOC's suit

> could expand to the remainder of Alabama, and potentially to other parts of BellSouth. BellSouth's concerns were based in part on the nature of the allegations in the EEOC case[,] including issues relating to the management assessment/testing, as well as[] the fact that several claimants in the case were represented by a prominent Birmingham plaintiffs' firm, Whatley Drake.[71]

Mr. Kochler further avers that, for such reasons,

> [a]pproximately one year ago, BellSouth inquired whether Terry Price and his law firm would be available and willing to represent the Company in the event that similar litigation were filed in Birmingham. Mr. Price confirmed that he would be willing to represent BellSouth in the event such a case were filed.[72]

One intriguing question arising from Mr. Kochler's Declaration is this: why would BellSouth "inquire[] whether Terry Price and his law firm would be available and willing to represent the Company in the event that similar litigation were filed *in Birmingham,*" in view of the fact that BellSouth already was represented in the action pending in the Southern District of Alabama by competent attorneys practicing in the Constangy firm's *Birmingham office* (*i.e.,* Chris Mitchell and

---

[70] Complaint (doc. no. 1) in *E.E.O.C. v. BellSouth Telecommunications, Inc.,* Civil Action No. 01-CV-0087-S (S.D. Ala. Feb. 1, 2001), at 1. (The action originally was assigned to Chief Judge Charles Butler, but subsequently was reassigned to Judge Callie V. S. Granade.)

[71] Doc. no. 11 (Defendant's Memorandum of Law in Opposition to Plaintiffs' Motion to Disqualify), Exhibit B ("Kochler Decl.") ¶ 4.

[72] *Id.* ¶ 5.

Charles A. Powell, IV)?[73]

Mr. Price's most recent Declaration attempts to address that question in the following

manner:

> In March 2001, Chris Mitchell of the Constangy, Brooks Firm asked me if I
> would become involved in the *EEOC v. BellSouth* case that had been filed in Mobile
> if that litigation expanded. I understood that this request came from BellSouth. *My*
> *Firm declined to get involved in the EEOC case because we had a conflict. Jerry*
> *Rose, an EEO Consultant with our Firm, was a Regional Attorney for the EEOC*
> *when the EEOC was handling the underlying charges in the Mobile case.*
> Subsequently, I was contacted by BellSouth to see if I would be available to represent
> it if a race discrimination class action was filed in Birmingham and the EEOC was
> not a party. I told BellSouth that I would be willing to represent it in the event such
> a case was filed.[74]

The persuasive force of that assertion is diminished by two facts. First, Lehr Middlebrooks's internet

Web site posts the following information for its EEO Consultant: "Jerome (Jerry) C. Rose served

as Regional Attorney for the Equal Employment Opportunity Commission from 1979 until *January,*

---

[73] Another aspect of Mr. Kochler's declaration that strains credulity grows from his assertion that BellSouth's inquiry with Mr. Price occurred "[a]pproximately one year ago." The declaration itself is not dated, but it was submitted to the court on May 24, 2002, as Exhibit "B" to BellSouth's initial brief in opposition to the subject motion. Thus, the inquiry would have occurred on or about *May 24, 2001*, but the "prominent Birmingham plaintiffs' firm, Whatley Drake," did not seek to intervene in the EEOC's action in the Southern District of Alabama on behalf of thirteen individual plaintiffs known as "the Jones intervenors" until *September 12, 2001*, and their motion to intervene was not granted until *September 14, 2001*. *See* the civil docket sheets in *E.E.O.C. v. BellSouth Telecommunications, Inc.*, Civil Action No. 01-CV-0087-S (S.D. Ala.), doc. nos. 23 & 24.

[74] Doc. no. 33 (Price Decl. filed July 26, 2002) ¶ 3 (emphasis supplied); *see also* Mr. Price's statement on the same subject during the July 26, 2002 hearing:

> Chris Mitchell [Constangy Brooks] called me shortly after the EEOC case was filed [in the Southern District of Alabama] and said, "If this case gets bigger, can you help us out?"
>
> If you look at our firm's bio, You Honor, you will notice that we had a new addition in January of 2001, and that is Jerry Rose, who is the former regional attorney of the EEOC. So after checking around, Your Honor, and looking at potential conflicts, *we decided that since Mr. Rose was the regional attorney when EEOC was processing these claims*, it would not be a good idea for us to join in that lawsuit, so we did not. That is the explanation, Your Honor, for why we did not become involved in that lawsuit. Then Paul Stagliano, who is Keith Kochler's assistant asked me, "If, then, there is no EEOC litigation, would you become involved?" And I said yes.

Tr. 40-41 (emphasis supplied).

*2001*, directing the litigation of discrimination cases on behalf of the Commission in Alabama and Mississippi."[75] Thus, Mr. Rose also was "Regional Attorney for the EEOC when the EEOC was handling [at least two of] the underlying charges in the [present] case": *i.e.*, those filed on *June 19, 2000*, by named plaintiffs Denise LeVert and Gladys Jenkins.[76]

In any event, as plaintiffs observe, the relevant question when attempting to address BellSouth's motive for ultimately retaining Mr. Price as local counsel for the present action is, "what happened after *this case* was filed?"

> BellSouth . . . claims that it had discussions with Mr. Price over a year before this case was filed about representing BellSouth in Birmingham. What is relevant in terms of the motives that went into the choice to ultimately retain his law firm was what happened after this case was filed. I mean, Lehr, Middlebrooks, Price, and Proctor was not retained *before* this case was filed and assigned to Judge Clemon. It was retained *after* this case was assigned to Judge Clemon.[77]

On that issue, the court first looks to several objective facts.

### 1.    BellSouth's knowledge of assignment

When the present action was filed on April 29, 2002, it was randomly assigned to Judge

---

[75] *See* http://www.lmpp.com/Html/bio_rose.html (emphasis supplied).

[76] *See* doc. no. 41 (Plaintiffs' Supplemental Brief on Evidence Produced at the July 26, 2002 Hearing), Exhibit C (Guerrier Affidavit) ¶ 3.

[77] Tr. 15-16 (emphasis supplied). Plaintiffs' counsel further observed during argument at the July 26th hearing:

> As it happens, [the case commenced in the Southern District of Alabama by the EEOC] raises a lot of very similar issues. It involves testing practices. Many of the class members overlap in the two cases. In fact, the Constangy case is probably — the class is a subset of the class members in this case. We feel that it would have been a very logical choice to think of Constangy as local counsel on this case. And yet that's not what happened.

> Similarly, there was a case pending in this district — I believe it's still open, and, in fact, in front of Judge Clemon — that was filed in 1993. It's called Wright v. South Central Bell; that also involves testing issues. And the local counsel in that case was I believe at the time Lange, Simpson, Robinson Somerville. And now many of those attorneys are at Ogletree, Deakins. But that's yet another source of not only qualified local counsel, but counsel that managed to be familiar with some of the issues in the case.

Clemon by a computer at the intake counter in the Clerk's office, which printed the label pasted on the first page of the complaint:[78] "CV-02-C-1057-S." Each letter, or group of letters and numbers, printed on the label is a code: *i.e.*, "CV" indicates the case is a "civil" action; "02" represents the last two digits of the calendar year in which the action was filed, 2002; "C" indicates the case was assigned to Chief Judge Clemon; "1057" indicates the case was the 1,057th civil action filed in this court during calendar year 2002; and, "S" indicates the case was docketed in the Southern Division of the Northern District of Alabama. Thus, the identity of the judge to whom the case had been assigned should have been immediately apparent to any competent attorney familiar with the procedures of this court.

Mr. Price is a competent attorney, and he confirmed during the July 26, 2002 hearing that he knew this action had been assigned to his uncle on the date of accepting employment as local counsel for BellSouth,[79] and, he ensured that BellSouth also possessed that knowledge.[80]

## 2.     The entry of appearance

One fact that struck both plaintiffs and this court as being at least "an unusual practice"[81] is the manner in which BellSouth's attorneys entered their appearance in this case. As noted in the beginning of this opinion, on May 10, 2002, eleven days after the action was commenced, a notice was filed stating simply that "Terry Price of Lehr Middlebrooks Price & Proctor, P.C., and Grace E. Speights and George A. Stohner of Morgan, Lewis & Bockius, LLP, [would appear] as counsel

---

[78] *See supra* note 9.

[79] Tr. 33-34.

[80] Mr. Price made clear that this topic had been discussed with BellSouth's corporate counsel when he said: "I know that if I enter the case what the operation of the rule is. I have an ethical obligation to tell my client, Your Honor, if they don't know it, what the operation of the rule is, because the law firm on the other side may fight it and cause them additional expense, and they need to know it up front." Tr. 44.

[81] *See* Tr. 16 (remarks of plaintiffs' counsel), and 26 (questioning of Mr. Price by the court).

for Defendant in the above-captioned matter."[82]  BellSouth had been served on May 2nd; thus, an

answer was not due until May 22, 2002.[83]  Further, the notice of appearance was submitted seven

days before BellSouth filed its "Motion for Declaratory Order" and "Motion for Emergency Status

Conference and Expedited Resolution of Motion for Declaratory Order."[84]  Plaintiffs believe "that

the prior notice of appearance raises the question of whether . . . there's some desire to get a preview

of who the case would ultimately be assigned to after Judge Clemon was forced to recuse himself."[85]

### 3.  BellSouth's previous retention of Terry Price

At the direction of this court, the assistant systems manager for all automated computer

functions of the Northern District of Alabama compiled a list of cases filed in this court from January

1, 1991, through July 25, 2002, in which BellSouth, or one of its various operating companies, was

listed as a party.[86]  The list contains 204 such cases,[87] which were randomly assigned upon initial

filing to nineteen different district or magistrate judges sitting on the Northern District of Alabama

bench.  Terry Price appeared as counsel for BellSouth in only four of those cases.[88]  Three of those

---

[82] Doc. no. 2.

[83] *See* Fed.R.Civ.P. 12(a)(1)(A) and doc. no. 9 (BellSouth's "Request for Extension of Time to Respond to Complaint," filed May 22, 2002).

[84] Doc. nos. 7 and 8, respectively, both filed May 17, 2002.

[85] Tr. 16.

[86] *See* Tr. 77-78.

[87]The list tendered to counsel during the July 26, 2002 hearing contained 208 cases, but four later were determined to be duplicate entries:  *i.e., Jenkins v. BellSouth Corp.,* Civil Action No. CV-02-C-1057; *Crowder v. BellSouth Telecommunications,* Civil Action No. CV-95-AR-1270-S; *Carroll v. BellSouth Telecommunications,* Civil Action No. CV-96-P-537-S; and, *Coleman v. BellSouth Telecommunications,* Civil Action No. CV-02-JEO-793-NE.

[88] Tr. 81-82.  In his most recent declaration, Mr. Price indicates that he "advise[d]" on a fifth case filed in this court, *Hutto v. BellSouth*, CV-95-N-03089-S (N.D. Ala. 1995) (Nelson, J.):

> During 1995, while still at Constangy, Brooks, I *represented* BellSouth in *Foster v. BellSouth*, CV-95-2378-DNJ (Jefferson County [Alabama] State Court 1995 [Tr. 38-39]) (fraud, severance pay denial); *Crowder v. BellSouth*, CV-95-C-1270-S (N.D. Ala. 1995) (ERISA - Wrongful Termination); and *Grant v. BellSouth* (Ga. [State Court] 1995 [Tr. 39]) (disability), and continued to

-40-

four cases were initially assigned to Judge Clemon: *i.e.*, *Crowder v. BellSouth* and *Carroll v. BellSouth*, both of which were discussed above, and the present action. The fourth case in which Mr. Price entered an appearance on behalf of BellSouth, *Coleman v. BellSouth Telecommunications*, does not withstand close scrutiny.

*Coleman v. BellSouth*, CV-02-JEO-793-NE, was filed on March 28, 2002, one month before the present action, and assigned to Magistrate Judge John E. Ott. The plaintiff's claim is based upon the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.* BellSouth's answer to the complaint was filed on April 22, 2002, the week before commencement of the present action, and it was signed by in-house counsel, Ruth Fife. Mr. Price did not enter an appearance in the case until July 3, 2002 — one month and nineteen days after the subject motion to disqualify had been filed. Again, however, Mr. Price entered the case by means of a "notice of appearance" which, plaintiffs suggest, "was also unmoored from any pleading or ostensible purpose, other than to create an example of Price's retention by BellSouth in a case not assigned to Judge Clemon."[89] This court agrees.

Excluding *Coleman v. BellSouth* from consideration, therefore, leads to a single conclusion: the *only* actions instituted against BellSouth in the United States District Court for the Northern District of Alabama in which Terry Price has entered an appearance as counsel for the company are those cases assigned to his uncle.

---

*advise* BellSouth on other matters, including *Hutto v. BellSouth*, CV-95-N-03089-S (N.D. Ala. 1995) (ERISA).

Doc. no. 33 (Price Decl. filed July 26, 2002) ¶ 2 (emphasis and bracketed alterations added). Mr. Price's usage of the terms "represented" and "advise[d]" obviously was intentional, because this court's file in *Hutto v. BellSouth*, CV-95-N-3089-S, reflects that Mr. Price did not appear as counsel of record.

[89] Doc. no. 41(Plaintiffs' Supplemental Brief on Evidence Produced at the July 26, 2002 Hearing), at 3.

-41-

In each instance, Mr. Price entered the case by means of filing a "notice of appearance," unhinged from any answer, motion, or other responsive pleading.[90] In both *Crowder* and *Carroll*, BellSouth was looking down the barrel of an imminent preliminary injunction hearing when Mr. Price's appearance triggered Judge Clemon's recusal.

The court concludes that, in the context of this case, BellSouth has failed to rebut the strong presumption that the reason for the selection of Terry Price as counsel was "to cause recusal or disqualification of the assigned judge."[91]

## C.    Application of the *Robinson* Factors

Even if defendant had rebutted the presumption created by the standing order, the court concludes that disqualification of Terry Price, the lawyer selected by BellSouth, and his law firm, Lehr Middlebrooks, rather than disqualification of Judge Clemon, to whom the case was randomly assigned, is appropriate in view of binding precedent, and, the extensive history of forced recusal of Judge Clemon in this district.

In *Robinson v. Boeing*, 79 F.3d 1053 (11th Cir. 1996), the Eleventh Circuit, reviewing the district court's decision denying defendant leave to associate new counsel,[92] reiterated that such

---

[90] In Mr. Price's own words, he did so "to let the Court [his uncle] know that I am on the other side." Tr. 27.

> I have not violated any ethical rule, Your Honor, by notifying my uncle who is a judge that I am in a case representing a client. Because of the operation of a statute, Your Honor, of which I had no part in enacting, he is obligated to disqualify himself.
>
> . . .
>
> That's simply notifying him that I am in the case. And because of the operation of a federal statute, he must recuse himself. But I know of nothing unethical about it. I do it in other cases, Your Honor. And it's not because of any particular motive.

Tr. 37.

[91] *See supra* section III.F (Standing Order).

[92] *See supra* section III.D.

determinations were within the broad discretion of the district judge, and his or her "superior understanding of local conditions and litigation tactics at the district court level." *Id.* at 1055.  The Court of Appeals listed seven factors district judges should consider when deciding whether to permit substitution or addition of counsel:  (1) the fundamental right to counsel; (2) the court's docket; (3) the injury to the plaintiff; (4) the delay in reaching decision; (5) the judicial time invested; (6) the expense to the parties objecting; and (7) the potential for manipulation or impropriety.  *Id.*

The *Robinson* Court further observed that

> [t]he twist in this case is whether delay caused by the disqualification of a trial judge, rather than delay caused by the need for time for preparation by substitute or additional counsel, somehow takes the decision outside the broad discretion afforded trial courts in these matters.  No authority has been provided to us, nor have we found any authority, which would suggest anything but that *delay for any reason is sufficient to bring the case within the exercise of discretion.*  In fact, the disqualification of a judge implicates several factors informing the judge's discretion, like judicial time spent, the court's docket, and the potential for manipulation. Judicial resources in this country are limited.  *It is incumbent on lawyers as officers of the court, as well as judges, to guard against actions and procedures to avoid the useless expenditure of judicial time.*  Although time alone would not necessarily reflect judicial attention, and consideration should be given to how much judicial work has actually been invested in a case, that evaluation is appropriately within the province of the trial judges.  Not only is it the time a judge might have spent on rulings on the case, *but the condition of crowded dockets and priorities on other judges' calendars.*  These are matters known to local judges and do not lend themselves to specific findings.

*Id.* (emphasis supplied).  Yet another "twist" is presented by this case — that is, whether those same considerations are applicable in determining whether the lawyer, rather than the judge, should be disqualified when the lawyer *initially* appears on behalf of a party, as opposed to attempting to intervene downstream, in an ongoing proceeding.

As noted above, *Robinson* involved the same basic factual issues as are presented here — *i.e.,* a party's attempt to retain Price's law firm in a case assigned to Judge Clemon.  The court concludes,

-43-

therefore, that the same policy considerations underlying the factors described by the Eleventh Circuit in *Robinson* are applicable here, and, *in this context*, there is no basis to distinguish the timing of the appearance of counsel that triggers the application of 28 U.S.C. § 455(b)(5)(ii). Accordingly, the court turns to the application of those factors.

### 1.   The fundamental right to counsel

As discussed above, civil litigants have a constitutional right to counsel, and, in normal circumstances, to counsel of their choice.  That right, however, is not unfettered, and may be overridden in "compelling circumstances."

Here, BellSouth has retained its counsel of choice — the large, nationally prominent law firm of Morgan, Lewis & Bockius. In effect, BellSouth is asking this court to also guarantee its right to retain *local* counsel of choice. BellSouth's argument that its fundamental right to counsel of choice will be abridged if Price is disqualified thus is significantly diluted.[93] Although BellSouth points to its preexisting relationship with Price and his representation in other matters, and its selection of him based on his legal ability, the record also is clear that BellSouth has previously retained other competent, Birmingham attorneys to represent its interests in actions involving issues similar to those here.[94]

BellSouth has made no showing that  it has an overriding need, which is of constitutional proportions, to be represented locally by Price that should trump other considerations. *See Robinson*, 79 F.3d at 1056.

---

[93] In the other cases discussed in this memorandum opinion, with the exception of *Robinson v. Boeing*, Price and his law firm were lead counsel.

[94] *See supra* note 75.

-44-

## 2.     The court's resources

Several considerations listed by the Eleventh Circuit implicate the trial court's resources: the court's docket; the delay in reaching decision; and, the judicial time invested. The Eleventh Circuit recognized, however, that those factors are difficult to evaluate, and are not susceptible to specific findings. Notwithstanding, several observations may be made with regard to the court's priorities and extremely limited resources. Moreover, because several judges of this court previously have confronted issues similar to those addressed in this opinion, these observations may be extrapolated to the Northern District of Alabama as a whole.

This court presently is operating with six active judges, rather than the seven allocated by Congress. As a nomination for the vacant seat has not yet been made, this condition likely will persist for many months, if not years, into the future. The weight of the caseload carried by the judicial officers of this court is staggering. Beyond the sheer number of cases, the issues faced by the judicial officers serving on this court are complex, and often novel. By way of example only, this judicial officer currently has an employment discrimination case that has been active for almost three decades,[95] an action challenging the constitutionality of an Alabama statute prohibiting the distribution of "any device designed or marketed as useful primarily for the stimulation of human genital organs,"[96] and, an action seeking class certification for civil rights violations arising from an insurance company's allegedly racially discriminatory rates over several decades.[97] Apart from the heavy civil docket, this court was assigned a thirty-one defendant criminal indictment, which is

---

[95] *See United States v. Jefferson County, et al.*, Civil Action Nos. CV-75-S-666-S, CV-74-S-17-S, and CV-74-S-12-S; *see also In re Birmingham Reverse Discrimination Employment Litigation*, CV-84-S-903-S.

[96] Alabama Code § 13A-12-200.2(a)(1) (1975) (Supp. 2001); *see also Williams v. Pryor*, 240 F.3d 944, 955-56 (11th Cir. 2001), *rev'g Williams v. Pryor*, 41 F. Supp. 2d 1257 (N.D. Ala. 1999).

[97] *Carnegie v. Mutual Savings Life Insurance Company*, Civil Action No. CV-99-S-3292-NE.

ongoing. This judicial officer has no doubt that the dockets of other judges called upon to resolve these recurring disqualification issues are similarly taxing.

With respect to the potential delay in reaching a decision in the present case, this judicial officer has spent a significant amount of time considering plaintiffs' motion to disqualify Lehr Middlebrooks — time which would have been better spent getting to the merits of plaintiffs' claims. While this court has attempted to resolve this matter as expeditiously as possible, the issues raised are sensitive and complex, and the parties' rights must not be compromised. Other judicial officers of this court faced with resolving similar disqualification issues, as detailed in section III *supra*, also have had to expend substantial amounts of time, delaying the ultimate disposition of those actions. Appeals of decisions on such disqualification issues have further delayed resolution of the merits of the particular claims.

Further, the judicial time invested in this matter has been inordinate, in view of the court's other responsibilities and priorities. The parties' briefs and evidentiary submissions, which have been reviewed carefully, fill three volumes of court files. The court has received evidence and heard oral argument, and has spent hours drafting this opinion. This judicial officer has one of the largest caseloads in the district. Resolution of this issue has imposed on the court's time and has taken time away from its own docket. The court will receive no statistical credit for this decision, and has not enjoyed the experience.

### 3.    The injury and expense to the plaintiffs

Two of the *Robinson* factors relate to plaintiffs:  injury to plaintiffs should the motion to disqualify Lehr Middlebrooks from representing BellSouth not be granted; and, the expense to plaintiffs.

-46-

Here, there is no real argument that plaintiffs will be injured if the case were reassigned to another judicial officer. This action is in its early stages, and plaintiffs would not be prejudiced by its random reassignment.

In contrast, there is no question that the expense to plaintiffs thus far, and the potential future expense relating to the resolution of the disqualification issue, is substantial. Plaintiffs have invested significant resources in prosecuting their motion to disqualify Lehr Middlebrooks. They have filed numerous pleadings and evidentiary submissions, and have orally argued their motion. Moreover, should BellSouth seek review of this decision, plaintiffs will incur additional expense. In sum, plaintiffs have directed resources to this issue that, undoubtedly, from their perspective, would have better served them in furthering their substantive claims.

### 4.      Potential for manipulation and impropriety

The final consideration identified by the Eleventh Circuit in *Robinson* is the heart of this matter. In *Robinson* — a case which, as here, involved allegations that the retention of Mr. Price's law firm  in an action assigned to Judge Clemon was an attempt to "judge shop" — the Court of Appeals observed that

> [t]he deciding judge was obviously concerned, as are other judges of [the Northern District of Alabama] about the possibility that in this district the choice of lawyers may sometimes be motivated by a desire to disqualify the trial judge to whom the case has been randomly assigned. . . . This potential for manipulation or impropriety may be considered, without making specific findings, a difficulty the deciding judge reflected upon in his opinion.

79 F.3d at 1056.

As should be clear from the foregoing discussion, the present action cannot be viewed in a vacuum. Rather, it must be viewed against the backdrop of the numerous actions in which such

issues, all involving the retention of Mr. Price's law firm in actions assigned to Judge Clemon, have arisen. In light of that history, the potential for manipulation or impropriety is obvious.

Of even greater importance to the resolution of the motion presented this court, however, are these facts: even though "BellSouth [had] interviewed other Birmingham firms" when the company became concerned that the EEOC's suit in the Southern District of Alabama might expand to the remainder of Alabama, and potentially to other parts of BellSouth;[98] and, even though BellSouth had been represented in that suit for fourteen months by competent and well-respected attorneys in the Birmingham office of the Constangy firm (*i.e.*, Chris Mitchell and Charles A. Powell, IV); and, even though BellSouth's Chief Counsel for Labor & Employment litigation matters knew *both* the identity of the judge to whom this action had been assigned *and* that Mr. Price's appearance would force recusal,[99] the company, nevertheless, "determined that Mr. Price was the most qualified [attorney] to be part of its defense team in this litigation."[100]

BellSouth plainly knew what the effect of retaining Lehr Middlebrooks in the present action would be. Mr. Price stated that it is his practice to advise all potential clients that his relationship with Judge Clemon triggers the operation of 28 U.S.C. § 455(b)(5)(ii).[101]   More importantly, BellSouth previously had retained Price and his law firm (at that time, Constangy, Brooks & Smith) in *Crowder v. BellSouth*, a case initially assigned to Judge Clemon, but from which he recused himself. Further, in that case, BellSouth was put on notice by Judge Acker that retaining Price's law firm in cases assigned to Judge Clemon would subject it to court scrutiny. The Eleventh Circuit also

---

[98] Kochler Decl. ¶ 4.

[99] *See supra* note 80.

[100] Kochler Decl. ¶ 4.

[101] *See supra* note 80.

-48-

noted Judge Acker's concerns by appending his order of June 2, 1995 to its decision in *Robinson.* *See* 79 F.3d at 1056 app.[102]

Although BellSouth makes much of the fact that it has retained Mr. Price's law firm at the initial stages of this action, rather than seeking substitution or addition of counsel, such a distinction is meaningless. The court sees no difference, once the judicial assignment is known, between retaining Price's law firm at once, or at some future date.

In sum, the court concludes that the balance of the *Robinson* factors tips in favor of plaintiffs. In view of the recurrence of this issue in the cases discussed extensively herein, the court concludes that disqualification of Lehr Middlebrooks, rather than disqualification of Judge Clemon, is warranted in these circumstances. To conclude otherwise would impugn the public's perception of the impartial and efficient administration of justice in the Northern District of Alabama. *See, e.g., McCuin,* 714 F.2d at 1265 ("To tolerate such gamesmanship would tarnish the concept of impartial justice. To permit a litigant to blackball a judge merely by invoking a talismanic 'right to counsel of my choice' would contribute to skepticism about and mistrust of our judicial system.")

### D. Judge Clemon's Relationship to a Putative Class Member

As an alternative basis for Judge Clemon's disqualification, BellSouth alleges that another of Judge Clemon's nephews, Billie Clemons, Jr., "*may be* a member of one of the putative classes alleged in this matter."[103] BellSouth states that Mr. Clemons presently is employed as a Facility Technician by BellSouth in Birmingham, and is paid on an hourly basis. BellSouth contends that Mr. Clemons's position with BellSouth *may* bring him within one of plaintiffs' alleged classes,

---

[102]In *Crowder,* Judge Acker identified fifteen cases, the first of which was filed January 20, 1993, in which Judge Clemon recused himself following the appearance of his nephew's law firm. As discussed in this memorandum opinion, there have been at least five additional cases, including the present action, in which this issue has arisen.

[103] Doc. no. 15, at 2 (emphasis supplied).

-49-

defined as "all current and former African American hourly employees who have been employed by BellSouth, including any Operating Company in which BellSouth at the time of employment maintained a controlling interest, at any time from April 29, 1998, through the present."[104]

Plaintiffs argue that, although Mr. Clemons may be a putative class member as the class is presently, broadly defined, "it is not at all clear that he will remain in the class as constituted at certification, or that his factual circumstances will entitle him to relief under *any* class definition."[105]

In similar circumstances, the Fifth Circuit addressed the issue of recusal in the context of a putative class action in *Tramonte v. Chrysler Corp.*, 136 F.3d 1025 (5th Cir. 1998). There, a district judge disclosed that members of her family previously had owned Chryslers, and that one family member then owned a Chrysler. The district judge did not recuse herself, however, stating that the family member who owned a Chrysler had no interest in joining the class.

The Fifth Circuit determined that the record was inadequate to permit review of the district judge's order denying Chrysler's motion to recuse. The Court of Appeals observed that "[t]he class petition is unclear as to the precise parameters of the putative class," such that there was no means of determining whether the district judge's family member would fall within the class definition. *Id.* at 1029. The Fifth Circuit held that

> where a judge, her spouse or a minor child residing in her household is a member of a putative class, there exists a "financial interest" in the case mandating recusal under § 455(b)(4).
>
> . . .
>
> A different result obtains, however, if [the district judge's] . . . family members are neither her spouse nor minor children, but are related to her within the

---

[104] Doc. no. 1( Complaint) ¶ 28(a).

[105] Doc. no. 17 (Plaintiffs' Brief in Support of Motion to Disqualify), at 15 (emphasis in original).

third degree, as specified by § 455(b)(5). In such a case, the statute requires recusal if the family members are a "party" to the class action. *But members of a putative class are not "parties" to a class action for these purposes.*

*Id.* at 1030 (emphasis supplied).

Judge Clemon's relationship to Mr. Billie Clemons does not, at this point, require his recusal, as Billie Clemons is not a "party" to the class action, but merely a putative class member. The court concludes that BellSouth's contention that Judge Clemon must recuse himself based upon his relationship to Mr. Clemons is premature. In arguing this point, BellSouth presupposes, first, that a class will be certified and, second, that its definition will include employees such as Mr. Clemons. If, and when, such a class is certified, BellSouth may make an appropriate motion.

Notwithstanding, as the Fifth Circuit recognized in *Tramonte,* "even if a judge's relative is not yet 'a party' to a class action, a judge *could* advance the interests of that relative in the pre-certification stage of class litigation." *Id.* (emphasis supplied). The *Tramonte* Court observed that 28 U.S.C. § 455(a) — which provides that a judge should recuse himself or herself from "any proceeding in which his [or her] impartiality might reasonably be questioned" — addresses such concerns. Whether Judge Clemon should recuse himself in the pre-certification stage of this action based upon § 455(a) is for him to determine.

### VI. CONCLUSION

For the foregoing reasons, plaintiffs' motion to disqualify the law firm of Lehr Middlebrooks Price & Proctor, P.C., from appearing as local counsel for defendant is due to be granted. An order consistent with this memorandum opinion will be entered contemporaneously herewith.

-51-

DONE this **26**ᵗʰ day of August, 2002.

United States District Judge