UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

GLADYS JENKINS, DENISE LEVERT, )
DAVID WILLIAMS, PEGGY JOHNSON, )
and SHARON GRIFFIN, on behalf of them- )
selves and all similarly situated persons, )
                                                          )
              Plaintiffs, )
                                                          )
vs.                                                          )    Civil Action No. CV-02-C-1057-S
                                                         )
BELLSOUTH CORPORATION, )
                                                         )
              Defendant. )

**ENTERED**
**SEP 1 3 2002**

### SUPPLEMENTAL MEMORANDUM OPINION

The memorandum opinion entered on August 30, 2002, addressing plaintiffs' motion to disqualify the Birmingham, Alabama law firm of Lehr, Middlebrooks, Price & Proctor, P.C. ("Lehr Middlebrooks") from appearing as local counsel for defendant, BellSouth Corporation,[1] is modified and supplemented by the following.

### I. SYNOPSIS OF PRIOR OPINION

This court previously found that: (i) on the date BellSouth retained Terry Price and Lehr Middlebrooks, the company knew that this case had been assigned to Chief Judge U.W. Clemon, and that the retention of Mr. Price and his firm would force Chief Judge Clemon's recusal under 28 U.S.C. § 455;[2] (ii) the only actions commenced in the United States District Court for the Northern District of Alabama during the preceding eleven years in which Mr. Price entered an appearance as

---

[1] *See* doc. nos. 5 (motion to disqualify), 49 (memorandum opinion), and 50 (order). (References herein to "doc. no. ___" are to the numbers assigned pleadings stamped by the Clerk as "filed".)

[2] *See* doc. no. 49 (Memorandum Opinion entered Aug. 26, 2002), at 35-38. 28 U.S.C. § 455(b)(5)(ii) requires any justice, judge, or magistrate judge of the United States to recuse himself when a person within the third degree of relationship to the judge is acting as a lawyer in the proceeding.

counsel for BellSouth were cases that had been assigned to his uncle, Chief Judge Clemon;[3] and (iii) that there existed in this District an extensive history of parties retaining either Mr. Price, or the firms in which he has practiced law, for the purpose of forcing the recusal of Judge Clemon.[4]

This court's principal conclusions of law were stated in alternative parts. The court first held that the policy considerations undergirding the Standing Order entered by former Chief Judge Sam C. Pointer, Jr., on July 15, 1996, applied to plaintiffs' motion for disqualification,[5] and that BellSouth had failed to rebut the presumption created by that order: *i.e.*, that BellSouth's motive for the retention of Mr. Price as counsel was to force recusal of the assigned judge.[6] This court alternatively held that, even if BellSouth had rebutted the presumption created by the standing order, disqualification of Mr. Price and his law firm still was appropriate in view of the factors delineated by the Eleventh Circuit in *Robinson v. Boeing*, 79 F.3d 1053 (11th Cir. 1996), and, the extensive history in this District of parties retaining either Mr. Price, or the firms in which he has practiced law, for the purpose of forcing the recusal of Judge Clemon.[7] Central to both holdings was the conclusion that the policy considerations supporting both the standing order and the *Robinson* decision applied in this context: in other words, once the judicial assignment is known, and a party

---

[3] *See* doc. no. 49 (Memorandum Opinion entered Aug. 26, 2002), at 40-41.

[4] *Id.* at 14-23, 24-27, and 42.

[5] *See id.* at 23-24 (text of Standing Order). This court held that the policy underlying the Standing Order "is more profound than the surface depth of its language," and that it

> implicitly acknowledges that proof of a party's motive or intent is difficult at best; and, accordingly, the order shifts the burden of persuasion to the party whose selection of counsel "would or might constitute grounds for recusal or disqualification of the judge to whom the case is assigned" by means of the creation of "a strong, but rebuttable, presumption" that the reason for the selection of such counsel was "to cause recusal or disqualification of the assigned judge."

*Id.* at 34-35.

[6] *Id.* at 42.

[7] *Id.* at 42-49.

thereafter retains counsel knowing that such representation will force the recusal of the judge to whom the case is assigned, there is no basis to distinguish the timing of the appearance of counsel that triggers the application of 28 U.S.C. § 455.[8]

Two fundamental principles buttressed both holdings. First, a civil litigant's constitutional right to representation by counsel of that party's choice does not entail absolute freedom of choice; rather, that right may be restricted when compelling circumstances exist: *e.g.*, as here, when a party employs counsel for the purpose of forcing the recusal of the judge to whom an action is assigned.[9] Stated differently, "counsel may not be chosen solely or primarily for the purpose of disqualifying the judge." *McCuin v. Texas Power & Light Co.*, 714 F.2d 1255, 1264 (5th Cir. 1983); *see also id.* at 1257 ("[I]f the district court should find . . . that the sole or primary motive for retaining the relative of the original judge was to disqualify that judge, the lawyer must be disqualified"); *Potashnick v. Port City Construction Co.*, 609 F.2d 1101, 1115 (5th Cir. 1980) ("[A] litigant should not be permitted to utilize a disqualification issue as part of his trial strategy.").[10] *Cf. United States v. Kelly*, 888 F.2d 732, 746 (11th Cir. 1989) ("[A] recusal issue may not be abused as an element of trial strategy.") (citing, *e.g.*, *Potashnick*, 609 F.2d at 1115).

A subsidiary principle is that a civil litigant's constitutional right to representation by counsel of that party's choice is significantly diluted when applied to local, as opposed to lead, counsel.[11] That is especially true in circumstances, such as the present case, where the record establishes that, during the eleven and one-half year period leading up to the commencement of this action, BellSouth

---

[8] *See* doc. no. 49 (Memorandum Opinion entered Aug. 26, 2002), at 43-44, 48-49.

[9] *Id.* at 27-32.

[10] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

[11] Doc. no. 49 (Memorandum Opinion entered Aug. 26, 2002), at 44.

retained Mr. Price as counsel in only three of 203 cases in which BellSouth or one of its various operating companies was listed as a party.[12]

## II. THE ISSUE OF THE "RELATED CASE"

En route to the foregoing findings of fact and conclusions of law, this court initially laid aside two contentious charges raised in the parties' briefs, which then were viewed as "digressive issues."[13] The first to be addressed was BellSouth's charge that plaintiffs had manipulated the assignment to Chief Judge Clemon by representing, on the civil cover sheet submitted with the complaint, that this action was "related" to another case then pending before Judge Clemon. This court rejected that charge, principally on the basis of evidence provided by Chief Deputy Clerk Sharon Harris, who testified that the "related case" reference had *no effect* upon the assignment of this action to Chief Judge Clemon. In pertinent part, Mrs. Harris attested that:

> When that section [of a civil cover sheet] is filled in for a related case, the intake clerk who makes the initial assignment takes no notice of that at all. That information is provided for the judicial officer. And we make a random assignment of the case, regardless of whether there's information there about a previously filed case that may or may not be related to it.
>
> The judicial officer can review that, and his or her law clerk generally calls it to the Court's attention. And then on the Court's own motion, or on the motion of the parties, the case can be reassigned to the judge who has the older filed case. But the clerk does not have any discretion about making a direct assignment to that judicial officer based on that.
>
> [There are] only two kinds of cases where the clerk has direction from the court to make a direct assignment to a judicial officer, and that's in the case that has been previously removed and remanded by the judicial officer. If it comes back to our court on a second removal, it's directly assigned to that judicial officer. And on

---

[12] *See id.* at 40-41. As in the original memorandum opinion, this court has excluded from consideration the case of *Coleman v. BellSouth*, CV-02-JEO-793-NE (N.D. Ala., filed Mar. 28, 2002), in which Mr. Price entered an appearance on July 3, 2002 — one month and nineteen days after the subject motion to disqualify was filed — ostensibly to demonstrate BellSouth's retention of him in a case not assigned to his uncle.

[13] *Id.* at 5.

a bankruptcy appeal, or a withdrawal from bankruptcy, if a judicial officer has reviewed the underlying bankruptcy action, we directly assign that to the judge. But in all other instances, it's a random assignment without regard to any indication in that section on the JS-44 [civil cover sheet].[14]

On the afternoon of August 29, 2002, however, Mrs. Harris informed this court that, contrary to the procedures described during her testimony, a deputy clerk working at the intake counter on the date this action was filed had directly assigned this action to Chief Judge Clemon, apparently because of the related case reference on the civil cover sheet. Mrs. Harris explained that, earlier that same day, and for the first time since plaintiffs' motion to disqualify had been filed, she reviewed the "Case Assignment System Audit Trail Report" for April 29, 2002, the date on which this action was commenced. A copy of that report is attached, and the "REMARKS" section following the fifteenth entry on the first page indicates a "Direct Assignment" based upon "related cases." The following day, this court notified the parties that it was withdrawing the order entered on August 26, 2002, for additional consideration, and directed the parties to submit briefs addressing the issue of what effect, if any, the foregoing fact should have upon the original decision.[15]

Upon consideration of the briefs and other matters submitted by the parties, this court concludes that a deputy clerk's failure to follow standard procedures should have no effect upon the original decision, granting plaintiffs' motion to disqualify the Lehr Middlebrooks firm from appearing as local counsel for BellSouth Corporation, but that the Clerk should be directed to conduct a redrawing of the judicial officer to whom this action is assigned in accordance with this District's standard, neutral, randomized selection procedures.

---

[14] Transcript of July 26, 2002 Hearing ("Tr."), at 68-70.

[15] *See* doc. no. 54 (Order entered Aug. 30, 2002).

## III. DISCUSSION

The Fifth Circuit dealt with circumstances similar to those presented here in *McCuin v. Texas Power & Light Co.*, 714 F.2d 1255 (5th Cir. 1983). There, plaintiffs filed an action in the Sherman Division of the United States District Court for the Eastern District of Texas. Chief Judge William Wayne Justice was the only judge assigned to that division. Six years after the action was filed, and two months after Chief Judge Justice granted plaintiffs' motion for class certification, Texas Power & Light Company ("Texas Power") sought to add, as co-counsel, the brother of Chief Judge Justice's wife, thereby implicating the same judicial recusal statute at issue here, 28 U.S.C. § 455(b)(5)(ii). Plaintiffs, as here, moved to disqualify the assigned judge's relative. *Id.* at 1258. Chief Judge Justice assigned the matter to another judge on his court, Robert Parker, for the purpose of ruling on plaintiffs' motion. Judge Parker determined that, notwithstanding the possibility that plaintiffs had filed the action in the Sherman Division, because they believed Chief Judge Justice would be favorably disposed to their claims, Texas Power "had intentionally created a conflict under the [disqualification] statute, and now seeks to benefit from the statute's protection."[16] *McCuin v. Texas Power & Light Co.*, 538 F. Supp. 311, 314 (E.D. Tex. 1982).

On appeal of that decision, the Fifth Circuit reversed, holding that Chief Judge Justice should not have taken *any* action in the case, even to reassign the motion to disqualify counsel to another judicial officer, once "he became aware that his brother-in-law had been enrolled as counsel." *McCuin*, 714 F.2d at 1257. Nonetheless, because the motion would remain pending for decision by another district judge, randomly selected, and because the issues had been fully briefed, the Fifth

---

[16] "The fact that the plaintiffs may well be guilty of forum shopping themselves, in filing their lawsuit in the Sherman Division to guarantee that Judge Justice would preside, offers no support to the Defendant in the present matter." *McCuin v. Texas Power & Light Co.*, 538 F. Supp. 311, 314 (E.D. Tex. 1982); *see also McCuin v. Texas Power & Light Co.*, 714 F.2d 1255, 1258 n.2 (5th Cir. 1983) (same).

Circuit proceeded to discuss "controlling principles," "to guide the district judge on remand." *Id.* at 1261; *see also id.* at 1257. Those principles are relevant to the issues facing this court.

**A.    Is Judge-Shopping Reprobated?**

The *McCuin* Court first examined the issue of whether "judge-shopping" is "reprobated," and concluded, on the basis of the following considerations, that it was not.

> Forum-shopping is sanctioned by our judicial system. It is as American as the Constitution, peremptory challenges to jurors, and our dual system of state and federal courts. The extension in Article III of federal judicial power to "controversies between citizens of different states," implemented by statute continuously since 1789, permits a plaintiff who might sue in a state court to select a federal forum for the claim. The statutory provision for removal to federal courts of such diversity cases filed in state court permits the defendant to opt for a federal forum. Virtually all causes of action created by federal law may be asserted in either a state or federal court. Many claims that may be asserted in the courts of one state may also be asserted in the courts of another. Not only may a litigant frequently select among several jurisdictions, he may, within a jurisdiction, lay venue in more than one court.
>
> The existence of these choices not only permits but indeed invites counsel in an adversary system, seeking to serve his client's interests, to select the forum that he considers most receptive to his cause. The motive of the suitor in making this choice is ordinarily of no moment: a court may be selected because its docket moves rapidly, its discovery procedures are liberal, its jurors are generous, the rules of law applied are more favorable, or the judge who presides in that forum is thought more likely to rule in the litigant's favor.
>
> Even in a particular forum, other tactical measures are available to determine who will be the trier of fact. For most causes of action, the plaintiff in a federal court may seek either a jury trial or a bench trial. In these cases, if the plaintiff waives trial by jury, the defendant may veto the bench trial by demanding a jury trial. Finally, the very existence of the peremptory challenge in jury cases bespeaks regard for some latitude in selection of the trier-of-fact on the basis of getting rid of those whom the lawyer considers unfavorably predisposed.
>
> In a perfect judicial system forum-shopping would be paradoxical. The same results would obtain in every forum and after every type of trial. But the actual litigation process is not a laboratory in which the same result is obtained after every test. In some situations, such as when a statute of limitations is involved, the choice of forum may determine the rule of law that will be applied. Even when legal rules

are identical, justice can be obtained only through human beings, and neither judges nor jurors are fungible. In recognition both of this and of the nature of the adversary, client-serving process, we tolerate a certain amount of manipulation without inquiry into motive.

Some states expressly permit judge-shopping, allowing the parties peremptory challenges to the judge. The possibility of permitting this maneuver in federal courts has been broached to the Congress, but never adopted. In federal court, the parties clearly have no right to a "judge of their choice."

*McCuin*, 714 F.2d at 1261-62 (footnotes omitted).

Conversely, the Fifth Circuit observed that civil litigants *do* have a right, though not an absolute right, to be represented by counsel of their choice. One reason for circumscribing that right emerges when counsel is "chosen solely or primarily for the purpose of disqualifying the judge." *Id.* at 1264. The *McCuin* Court observed that the congressional authors of 28 U.S.C. § 455 had "warned that 'each judge must be alert to avoid the possibility that those who would [seek his disqualification] are in fact seeking to avoid the consequences of his expected adverse decision.'" *Id.* (quoting H.R.Rep. No. 1453, 93d Cong., 1st Sess. (1973), *reprinted in* 1974 U.S.C.C.A.N. 6351, 6355) (bracketed alteration in original). The vigilance advocated by the drafters of § 455 necessarily focuses on the conduct of *the party* whose selection of counsel forces recusal of the judge to whom the action has been assigned, as the *McCuin* Court clearly implied when stating that: "A lawyer should not . . . lend himself to a contrivance by which his services are sought not for his ability but solely because his relationship with a judge *enables the litigant who employs him* to exercise a *de facto* peremptory challenge to the judge." *Id.* (emphasis added) (footnote omitted). That is what occurred here, and this court holds that its original decision, disqualifying the Lehr Middlebrooks firm as local counsel for BellSouth in all further proceedings herein, is due to be confirmed. *See id.* at 1257 ("We conclude that, if the district court should find . . . that the sole or primary motive for

-8-

*retaining* the relative of the original judge was to disqualify that judge, *the lawyer must be disqualified*.") (emphasis supplied).

## B. A Dissenting Opinion on the Propriety of Judge Shopping

With deference to the superiority of judges who serve upon any of the federal Courts of Appeals, this judicial officer possesses reservations about the Fifth Circuit's determination that forum shopping — and, thereby, the practice of judge shopping — is "sanctioned by our judicial system." While all of the examples cited by the *McCuin* Court support that conclusion, this judge desires to register a dissenting point of view, which will lead to the final holding of the court.

### 1. The nature of the judiciary and the virtue of neutral assignment procedures

The habit of lawyers and litigants to describe some judicial officers in flattering terms (*e.g.*, "impartial," "fair," "even tempered") and others with invective (*e.g.*, "biased," "unfair," "overbearing") turns, more often than not, upon the fact of whose legal ox was gored. This practice presents a paradox: it reflects personal experience, while simultaneously ignoring the inherent nature of our species. Judges, being human, unavoidably bring the accumulated experiences of their lives to the position, and those imponderable variables inevitably work subtle effects upon their demeanor and disposition.[17]

---

[17] As Justice Douglas observed in *Chandler v. Judicial Council of the Tenth Circuit*, 398 U.S. 74, 90 S.Ct. 1648, 26 L.Ed.2d 100 (1970):

> Judges are not fungible; they cover the constitutional spectrum; and a particular judge's emphasis may make a world of difference when it comes to rulings on evidence, the temper of the courtroom, the tolerance for a proffered defense, and the like. Lawyers recognize this when they talk about "shopping" for a judge; Senators recognize this when they are asked to give their "advice and consent" to judicial appointments; laymen recognize this when they appraise the quality and image of the judiciary in their own community.

*Id.* at 137, 90 S.Ct. at 1681 (Douglas, J., dissenting); *see also Laird v. Tatum*, 409 U.S. 824, 834-35, 93 S.Ct. 7, 34 L.Ed.2d 50 (1972) (Rehnquist, J., memorandum) (same); *Del Vecchio v. Illinois Department of Corrections*, 31 F.3d 1363, 1372 (7th Cir. 1994) (en banc) ("Judges are human; like all humans, their outlooks are shaped by their lives' experiences. It would be unrealistic to suppose that judges do not bring to the bench those experiences and the attendant

Of course, these thoughts are not new; they are as old as the common law — the life of which, as Holmes said, "has not been logic: it has been experience."

> The felt necessities of the time, the prevalent moral and political theories, intuitions of public policy, avowed or unconscious, even the prejudices which judges share with their fellow-men, have had a good deal more to do than the syllogism in determining the rules by which men should be governed. The law embodies the story of a nation's development through many centuries, and it cannot be dealt with as if it contained only the axioms and corollaries of a book of mathematics. . . .

O.W. Holmes, Jr., *The Common Law* 1 (1881). Indeed, as Justice Cardozo observed,

> [t]here is in each of us a stream of tendency, whether you choose to call it philosophy or not, which gives coherence and direction to thought and action. Judges cannot escape that current any more than other mortals. All their lives, forces which they do not recognize and cannot name, have been tugging at them — inherited instincts, traditional beliefs, acquired convictions; and the resultant is an outlook on life, a conception of social needs, a sense in James's phrase of "the total push and pressure of the cosmos," which, when reasons are nicely balanced, must determine where choice shall fall. In this mental background every problem finds its setting. We may try to see things as objectively as we please. None the less, we can never see them with any eyes except our own. To that test they are all brought — a form of pleading or an act of parliament, the wrongs of paupers or the rights of princes, a village ordinance or a nation's charter.

Benjamin N. Cardozo, *The Nature of the Judicial Process* 12-13 (1921) (footnote omitted).[18] To the extent that lawyers and litigants expect judges to be devoid of preconceptions and predispositions,

---

biases they may create.").

[18] Justice Cardozo essayed similar thoughts three years later, when he wrote:

> In the present state of our knowledge, the estimate of the comparative value of one social interest and another, when they come, two or more of them, into collision, will be shaped for the judge, as it is for the legislator, in accordance with an act of judgment in which many elements coöperate. It will be shaped by his experience of life; his understanding of the prevailing canons of justice and morality; his study of the social sciences; at times, in the end, by his intuitions, his guesses, even his ignorance or prejudice. The web is tangled and obscure, shot through with a multitude of shades and colors, the skeins irregular and broken. Many hues that seem to be simple, are found, when analyzed, to be a complex and uncertain blend. Justice itself, which we are wont to appeal to as a test as well as an ideal, may mean different things to different minds and at different times. Attempts to objectify its standards, or even to describe them, have never wholly succeeded. . . .

Benjamin N. Cardozo, *The Growth of the Law* 85-86 (1924) (footnote omitted).

therefore, they expect a circumstance that is not obtainable in this life. Judge Jerome Frank shaped the point eloquently when he said:

> Democracy must, indeed, fail unless our courts try cases fairly, and there can be no fair trial before a judge lacking in impartiality and disinterestedness. If, however, "bias" and "partiality" be defined to mean the total absence of preconceptions in the mind of the judge, then no one has ever had a fair trial and no one ever will.

*In re Linahan*, 138 F.2d 650, 651 (2d Cir. 1943).

Ultimately, the power of the federal judiciary to act as a cementitious institution, binding the disparate and discordant elements of our democratic republic into an orderly whole, rests upon nothing more substantial than the ethereal virtue of persuasion, and, the public's perception of principled decision-making. Of these sheer supports, only the latter leg is capable of being braced by *institutional* procedures. The prevention of judge shopping by *any party* enhances public confidence in the assignment process and, thereby, the integrity of the judicial system. "Indeed, it has been noted by at least one commentator that 'random assignment protects the integrity of the judicial system by leaving the pairing of cases and judges to chance.'" *United States v. Phillips*, 59 F. Supp. 2d 1178, 1180 (D. Utah 1999) (citation omitted).[19] In the end, "the system can do no more than ensure that, whatever biases judges bring to the decisionmaking process, they play no role in the assignment process. Judges and cases are to be paired randomly, *not deliberately*." Brown & Lee, *supra* at 1069 (emphasis supplied) (footnotes omitted).

> The random assignment of cases, and the random reassignment in the event of disqualification, has the obvious, commonsensical and beneficial purpose of maintaining the public's confidence in the integrity of the judiciary. This purpose is defeated when cases or motions are assigned, or reassigned, to judges who are handpicked to decide the particular case or motion in question. A system of random

---

[19] Incidentally, and not insignificantly, as far as the active judges of this court are concerned, a random selection process "ensures an equitable distribution of the case load among the judges. . . ." *United States v. Mavroules*, 798 F. Supp. 61 (D. Mass 1992).

assignment is purely objective and is not open to the criticism that business is being assigned to particular judges in accordance with any particular agenda.

*Grutter v. Bollinger*, 16 F. Supp. 2d 797, 802 (E.D. Mich. 1998).

This judicial officer believes that neutral assignment of cases to judges through a randomized selection process[20] constrains judge shopping by plaintiffs or prosecutors — just as the proscription against a party's retention of a relative of the original judge for the sole or primary purpose of disqualifying that judge acts to curb the same practice by defendants — and that both policies unite to promote the integrity of the judicial system. The court therefore agrees with BellSouth that this action should be referred to the Clerk for a neutral redrawing in accordance with standard, randomized selection procedures.

---

[20] Neutrality and randomness are not synonymous. As used here, the term "neutral" means that a case is not assigned to a particular judge in an effort to influence the outcome of that action. *See Webster's Third New International Dictionary* 1521 (1993) (defining neutral as "not engaged on either side: not siding with or assisting either of two or more contending parties"). Randomness is one means of creating neutrality. The term "random," however, connotes an equal probability of occurrence. *See Webster's II New Riverside University Dictionary* 973 (1994) (defining random as "designating a sample drawn from a population so that each member of the population has an equal chance to be drawn."). Under that definition, the method of assigning cases in this District is not random. The Northern District of Alabama encompasses thirty-one counties divided among seven divisions, defined by 28 U.S.C. § 81(a). Although Congress has authorized seven active judges for service on this court, *see* 28 U.S.C. § 133(a), no one judge is assigned all cases filed in any statutory division. There are several reasons for that fact. Foremost is the fact that, as in *McCuin v. Texas Power & Light, supra*, when only one judge draws cases in a particular division, and a plaintiff has a choice of venues in which an action might be filed, the procedure would encourage judge shopping. Consequently, this court follows the practice of dividing the cases filed in each division among at least two active judges and, when resources and preferences permit, one or more of the Senior Judges. Another reason that no one judge is assigned all cases filed in any statutory division is that the number of case filings vary widely. For example, during calendar year 2001, more than 1,700 cases were filed in the Southern division, as compared to only 164 in the Jasper division. Thus, in an effort to achieve an equitable distribution of the total caseload, cases are allocated among the judges in the manner described by Chief Deputy Clerk Harris during her testimony at the July 26th hearing. *See* doc. no. 49 (Memorandum Opinion entered Aug. 26, 2002), at 3 n.9. Moreover, even though all judges (with the exception of Senior Judge Robert Propst) participate in the Southern division draw, each does not receive an equal number. Rather, the per-judge percentage of assignments reflects each judge's other divisional assignments, and the relative per-capita allocations are adjusted periodically in an effort to achieve an equitable distribution of the total caseload. While the foregoing variables reduce "randomness," in the sense of connoting an equal probability that any particular judge will be assigned a case, they do not defeat the goal of "neutral" assignments, because "they are objective and do not involve so much discretion so as to permit outcome-oriented assignments." J. Robert Brown, Jr. & Allison Herren Lee, *Neutral Assignment of Judges at the Court of Appeals*, 78 Tex. L. Rev. 1037, 1041 n.17 (2000).

C.   **Tying Up Loose Ends**

This court is troubled by the fact that standard assignment procedures were not followed by a deputy clerk in this instance, and by BellSouth's suggestion that plaintiffs attempted to manipulate or influence the assignment. Any "attempts to manipulate the random case assignment process are subject to universal condemnation." *Phillips*, 59 F. Supp. 2d at 1180 (collecting authorities). Departure from neutral assignment procedures calls into question the hallmarks of our judicial system, fairness and impartiality, and invites "public skepticism of the ability to receive justice in our court system. . . ." Kimberly Jade Norwood, *Shopping for Venue: The Need for More Limits on Choice*, 50 U. Miami L. Rev. 267, 300 (1996). Regardless of the particular circumstances surrounding the direct assignment of this action to Chief Judge Clemon, the fact remains that the deputy clerk was not authorized to deviate from established procedures. Not even the Clerk of this court possesses such authority.

> By statute, the power to divide the business of the court is vested only in the judges of this court. *See* 28 U.S.C. § 137. It is through promulgation of local court rules or standing orders that the judges exercise this power. *See id.* . . . It is clear that neither under these rules nor under any statute has the clerk of the court been given any power to make any changes to the court's adopted random case assignment system.

*Phillips*, 59 F. Supp. 2d at 1182-83.

As BellSouth suggests, further investigation of these issues is warranted, but that inquiry is the prerogative of this court or the Eleventh Circuit Judicial Council, not the parties. *See* 28 U.S.C. § 137.[21] In that connection, this judicial officer has undertaken a preliminary review of records

---

[21] 28 U.S.C. § 137 reads as follows:

> The business of a court having more than one judge shall be divided among the judges as provided by the rules and orders of the court.
>
> The chief judge of the district court shall be responsible for the observance of such rules and orders, and shall divide the business and assign the cases so far as such rules and orders do not

retrieved from the court's internal database of cases that were directly, rather than neutrally, assigned, and the deputy clerk's notation of the reason for the direct assignment. Thankfully, for the two-year period beginning on April 29, 2000, and extending through April 29, 2002, no other directly assigned cases referenced a "related case" as the basis for assignment. Any further inquiry, however, is not appropriate in this forum; rather, it is a matter for the entire court, not one judge.

## IV. CONCLUSION

This court rejects BellSouth's contention that the August 26th order and memorandum opinion should be vacated as moot, arguably because there no longer is a need to disqualify Lehr Middlebrooks as a remedial measure. The fact that this action originally was not assigned in accordance with this District's neutral assignment procedures does not negate BellSouth's motive for retaining Terry Price as counsel. BellSouth's assertion that, "[b]ecause there is no longer any random assignment to preserve, there is no longer any reason to disqualify Mr. Price,"[22] is unavailing. To credit that view, this court would have to ignore the long history of the forced recusal of Judge Clemon in this District, examined in detail in the August 26th memorandum opinion, and observed by other judges of this court and the Eleventh Circuit.

While it is true that this court assumed in its August 26th opinion that this action originally was assigned in accordance with established procedures, the potential for manipulation and impropriety by a party seeking to retain Mr. Price or his law firm in a case assigned to Judge Clemon remains unchanged, regardless of the manner in which the case actually was assigned. BellSouth

---

otherwise prescribe.

If the district judges in any district are unable to agree upon the adoption of rules or orders for that purpose the judicial council of the circuit shall make the necessary orders.

[22]Doc. no. 56 (Defendant's Brief in Response to Court's Order of August 30, 2002), at 18-19.

knew that this action had been assigned to Judge Clemon. BellSouth knew that, if it retained Terry Price as local counsel, the effect would be to force Judge Clemon's recusal. Despite the revelation that this action was not assigned in the normal manner, those facts cannot be erased, and will not be ignored by this court.

On the other hand, it is undisputed that this case was directly and, therefore, improperly assigned to Chief Judge Clemon when initially filed on April 29, 2002. To correct that error, the Clerk and his Chief Deputy shall be ordered to redraw the judicial officer assignment from the list of all judges accepting civil case assignments in the Southern division, through the use of this District's standard, neutral, randomized selection procedures. The reselection shall occur at the intake counter in the Clerk's office at Noon on Monday, September 16, 2002. Counsel for all parties may be present and observe, if they desire.

A separate order consistent with the memorandum opinion entered on August 26, 2002, as modified and extended by this supplemental opinion, will be entered contemporaneously herewith.

DONE this 13th day of September, 2002.

                                                */s/ Lynwood Smith*
                                                United States District Judge

CASE ASSIGNMENT SYSTEM
AUDIT TRAIL REPORT

Page    1

Transaction Dates: 04/29/2002 - 04/29/2002

| DATE | TIME | CASE NUMBER | JUDGE | CATEGORY | TRANSACTION | DATA ENTRY OPERATOR |
|---|---|---|---|---|---|---|
| 04/29/02 | 09:06:28 | 2:02CV01053 | Judge Karon O. Bowdre | Southern | Random Assignment | sbuhler |
| 04/29/02 | 09:49:00 | 2:00RF00058 | Senior Judge J. Foy Guin | Judge Referral | Void | julia |
| REMARKS: need a new DJ for R&R | | | | | | |
| 04/29/02 | 09:49:57 | 2:00RF00058 | Judge Edwin L. Nelson | Judge Referral | Random Assignment | julia |
| 04/29/02 | 09:51:24 | 2:02CV01054 | Judge James H. Hancock | Southern | Random Assignment | coleman |
| 04/29/02 | 10:23:00 | 5:00RF00644 | Judge U. W. Clemon | Judge Referral | Void | coleman |
| REMARKS: new motion to be referred | | | | | | |
| 04/29/02 | 10:23:00 | 5:00RF00644 | Judge U. W. Clemon | Judge Referral | Card Added to Deck | coleman |
| REMARKS: Card added via void | | | | | | |
| 04/29/02 | 10:23:56 | 5:00RF00644 | Senior Judge J. Foy Guin | Judge Referral | Random Assignment | coleman |
| 04/29/02 | 10:24:00 | 5:00RF00644 | Senior Judge J. Foy Guin | Judge Referral | Recusal | coleman |
| REMARKS: recusal list | | | | | | |
| 04/29/02 | 10:25:20 | 5:00RF00644 | Judge U. W. Clemon | Judge Referral | Random Assignment | coleman |
| 04/29/02 | 10:34:01 | 5:02CV01055 | Judge Inge P. Johnson | Northeastern | Random Assignment | sbuhler |
| 04/29/02 | 11:16:59 | 2:02EE00009 | Judge Edwin L. Nelson | EEOC Title VII Ca | Random Assignment | coleman |
| 04/29/02 | 11:23:11 | 2:01RF00940 | Judge U. W. Clemon | Judge Referral | Random Assignment | julia |
| 04/29/02 | 11:35:09 | 6:02RF00935 | Senior Judge J. Foy Guin | Judge Referral | Random Assignment | shiretta |
| 04/29/02 | 12:22:19 | 4:02CV01056 | Judge Karon O. Bowdre | Social Security | Random Assignment | coleman |
| ✓ 04/29/02 | 12:31:53 | 2:02CV01057 | Judge U. W. Clemon | Southern | Direct Assignment | coleman |
| REMARKS: related cases | | | | | | |
| 04/29/02 | 14:10:13 | N/A | N/A | Magistrate-Judge | Deck Discarded [5 cards total] | coleman |
| REMARKS: Threshold of 100% reached.  Auto reset invoked. | | | | | | |
| 04/29/02 | 14:10:13 | N/A | Magistrate T. Michael Putnam | Magistrate-Judge | Deck Discarded [a:1 u:0] | coleman |
| 04/29/02 | 14:10:13 | N/A | Magistrate Harwell G. Davis, III | Magistrate-Judge | Deck Discarded [a:1 u:0] | coleman |
| 04/29/02 | 14:10:13 | N/A | Magistrate Robert R. Armstrong, Jr | Magistrate-Judge | Deck Discarded [a:1 u:0] | coleman |
| 04/29/02 | 14:10:13 | N/A | Magistrate John E. Ott | Magistrate-Judge | Deck Discarded [a:1 u:0] | coleman |
| 04/29/02 | 14:10:13 | N/A | Magistrate Paul W. Greene | Magistrate-Judge | Deck Discarded [a:1 u:0] | coleman |
| 04/29/02 | 14:10:13 | N/A | N/A | Magistrate-Judge | Deck Created [5 cards total] | coleman |
| REMARKS: Threshold of 100% reached.  Auto reset invoked. | | | | | | |
| 04/29/02 | 14:10:13 | N/A | Magistrate Harwell G. Davis, III | Magistrate-Judge | Deck Created [a: 0 u: 1] | coleman |
| 04/29/02 | 14:10:13 | N/A | Magistrate John E. Ott | Magistrate-Judge | Deck Created [a: 0 u: 1] | coleman |
| 04/29/02 | 14:10:13 | N/A | Magistrate Paul W. Greene | Magistrate-Judge | Deck Created [a: 0 u: 1] | coleman |

CASE ASSIGNMENT SYSTEM
AUDIT TRAIL REPORT

Page     2

Transaction Dates: 04/29/2002 - 04/29/2002

| DATE | TIME | CASE NUMBER | JUDGE | CATEGORY | TRANSACTION | DATA ENTRY OPERATOR |
|---|---|---|---|---|---|---|
| 04/29/02 | 14:10:13 | N/A | Magistrate Robert R. Armstrong, Jr | Magistrate-Judge | Deck Created [a: 0 u: 1] | coleman |
| 04/29/02 | 14:10:13 | N/A | Magistrate T. Michael Putnam | Magistrate-Judge | Deck Created [a: 0 u: 1] | coleman |
| 04/29/02 | 14:10:23 | 5:02CV01058 | Magistrate T. Michael Putnam | Magistrate-Judge | Random Assignment | coleman |
| 04/29/02 | 14:48:10 | 2:02CV01059 | Judge Karon O. Bowdre | Southern | Random Assignment | coleman |
| 04/29/02 | 14:54:46 | 5:02CV01060 | Judge James H. Hancock | Northeastern | Random Assignment | coleman |
| 04/29/02 | 15:06:21 | 2:02MV08023 | Judge Edwin L. Nelson | Motion to vacate | Direct Assignment | coleman |
| REMARKS: sentencing judge | | | | | | |
| 04/29/02 | 15:17:33 | 2:02CV01061 | Judge William M. Acker, Jr. | Southern | Random Assignment | coleman |
| 04/29/02 | 15:19:24 | 2:02CV01062 | Judge Sharon Lovelace Blackburn | Southern | Random Assignment | coleman |
| 04/29/02 | 15:21:02 | 5:02CV01063 | Judge William M. Acker, Jr. | Habeas Corpus Cas | Random Assignment | coleman |
| 04/29/02 | 15:22:28 | 2:02CV01064 | Magistrate Harwell G. Davis, III | Magistrate-Judge | Random Assignment | coleman |
| 04/29/02 | 15:25:00 | 5:01CV03053 | Judge Sharon Lovelace Blackburn | Northeastern | Void | coleman |
| REMARKS: Sirote | | | | | | |
| 04/29/02 | 15:25:00 | 5:01CV03053 | Judge Sharon Lovelace Blackburn | Northeastern | Card Added to Deck | coleman |
| REMARKS: Card added via void | | | | | | |
| 04/29/02 | 15:25:40 | 5:01CV03053 | Judge Sharon Lovelace Blackburn | Northeastern | Random Assignment | coleman |
| 04/29/02 | 15:26:00 | 5:01CV03053 | Judge Sharon Lovelace Blackburn | Northeastern | Recusal | coleman |
| REMARKS: Sirote | | | | | | |
| 04/29/02 | 15:26:18 | 5:01CV03053 | Judge Inge P. Johnson | Northeastern | Random Assignment | coleman |
| 04/29/02 | 15:27:18 | 2:02CV01065 | Judge Edwin L. Nelson | Southern | Random Assignment | coleman |
| 04/29/02 | 15:28:17 | 5:02MG01063 | Magistrate Harwell G. Davis, III | Mag.-Habeas Corpu | Random Assignment | coleman |
| 04/29/02 | 15:28:50 | 2:02MG01065 | Magistrate Harwell G. Davis, III | Mag.-Habeas Corpu | Random Assignment | coleman |
| 04/29/02 | 15:41:07 | 2:02CV01066 | Judge Sharon Lovelace Blackburn | Southern | Random Assignment | coleman |
| 04/29/02 | 15:45:16 | 4:02CV01067 | Senior Judge J. Foy Guin | Social Security | Random Assignment | coleman |
| 04/29/02 | 15:46:59 | 5:02CV01068 | Judge C. Lynwood Smith, Jr. | Northeastern | Random Assignment | sbuhler |
| 04/29/02 | 15:52:25 | 3:02CV01069 | Magistrate John E. Ott | Magistrate-Judge | Random Assignment | coleman |
| 04/29/02 | 16:06:33 | 2:02CV01070 | Judge Inge P. Johnson | Social Security | Random Assignment | coleman |
| 04/29/02 | 16:09:35 | 4:02CV01071 | Senior Judge J. Foy Guin | Habeas Corpus Cas | Random Assignment | coleman |
| 04/29/02 | 16:10:00 | 4:02CV01071 | Senior Judge J. Foy Guin | Habeas Corpus Cas | Void | coleman |
| REMARKS: No more petition on Habeas Corpus accept | | | | | | |
| 04/29/02 | 16:11:09 | 4:02CV01071 | Senior Judge J. Foy Guin | Habeas Corpus Cas | Random Assignment | coleman |

CASE ASSIGNMENT SYSTEM
AUDIT TRAIL REPORT

Transaction Dates: 04/29/2002 - 04/29/2002

| DATE | TIME | CASE NUMBER | JUDGE | CATEGORY | TRANSACTION | DATA ENTRY OPERATOR |
|---|---|---|---|---|---|---|
| 04/29/02 | 16:12:00 | 4:02CV01071 | Senior Judge J. Foy Guin | Habeas Corpus Cas | Recusal | coleman |
| REMARKS: no HC case | | | | | | |
| 04/29/02 | 16:12:42 | 4:02CV01071 | Judge William M. Acker, Jr. | Middle | Random Assignment | coleman |
| 04/29/02 | 16:13:11 | 4:02CV01072 | Judge Robert B. Propst | Middle | Random Assignment | coleman |
| 04/29/02 | 16:19:50 | 2:02CV01073 | Judge James H. Hancock | Southern | Random Assignment | coleman |
| 04/29/02 | 16:22:00 | 2:02CV01073 | Judge James H. Hancock | Southern | Void | coleman |
| REMARKS: habeas corpus cases | | | | | | |
| 04/29/02 | 16:25:24 | 2:02CV01073 | Senior Judge J. Foy Guin | Habeas Corpus Cas | Random Assignment | coleman |
| 04/29/02 | 16:27:00 | 2:02CV01073 | Senior Judge J. Foy Guin | Habeas Corpus Cas | Void | coleman |
| REMARKS: no habeas coepus cases | | | | | | |
| 04/29/02 | 16:27:00 | 2:02CV01073 | Judge James H. Hancock | Southern | Void | coleman |
| REMARKS: reached limit for month | | | | | | |
| 04/29/02 | 16:27:19 | 2:02CV01073 | Judge James H. Hancock | Southern | Random Assignment | coleman |
| 04/29/02 | 16:27:54 | 2:02CV01073 | Judge William M. Acker, Jr. | Southern | Random Assignment | coleman |
| 04/29/02 | 16:31:22 | 2:02CV01074 | Senior Judge J. Foy Guin | Habeas Corpus Cas | Random Assignment | coleman |
| 04/29/02 | 16:32:00 | 2:02CV01074 | Senior Judge J. Foy Guin | Habeas Corpus Cas | Void | coleman |
| REMARKS: Habeas Corpus casses | | | | | | |
| 04/29/02 | 16:32:45 | 2:02CV01075 | Magistrate Paul W. Greene | Magistrate-Judge | Random Assignment | coleman |
| 04/29/02 | 16:33:00 | 2:02CV01075 | Magistrate Paul W. Greene | Magistrate-Judge | Void | coleman |
| REMARKS: errror make an filing | | | | | | |
| 04/29/02 | 16:33:51 | 2:02CV01074 | Magistrate Robert R. Armstrong, Jr | Magistrate-Judge | Random Assignment | coleman |
| 04/29/02 | 16:34:43 | 5:02CV01075 | Judge C. Lynwood Smith, Jr. | Northeastern | Random Assignment | coleman |
| 04/29/02 | 16:35:46 | 7:02CV01076 | Senior Judge J. Foy Guin | Habeas Corpus Cas | Random Assignment | coleman |
| 04/29/02 | 16:36:00 | 7:02CV01076 | Senior Judge J. Foy Guin | Habeas Corpus Cas | Recusal | coleman |
| REMARKS: No Habeas Corpus | | | | | | |
| 04/29/02 | 16:38:14 | 7:02CV01076 | Senior Judge J. Foy Guin | Habeas Corpus Cas | Direct Assignment | coleman |
| REMARKS: rebuilt decks  *forcing deck to rebuild - JFG out of deck* | | | | | | |
| 04/29/02 | 16:39:00 | 7:02CV01076 | Senior Judge J. Foy Guin | Habeas Corpus Cas | Bye | coleman |
| REMARKS: no habeas corpus cases | | | | | | |
| 04/29/02 | 16:39:17 | N/A | N/A | Habeas Corpus Cas | Deck Discarded [11 cards total] | coleman |
| REMARKS: Threshold of 100% reached.  Auto reset invoked. | | | | | | |
| 04/29/02 | 16:39:17 | N/A | Judge U. W. Clemon | Habeas Corpus Cas | Deck Discarded [a:1 u:0] | coleman |
| 04/29/02 | 16:39:17 | N/A | Judge Edwin L. Nelson | Habeas Corpus Cas | Deck Discarded [a:1 u:0] | coleman |
| 04/29/02 | 16:39:17 | N/A | Senior Judge J. Foy Guin | Habeas Corpus Cas | Deck Discarded [a:1 u:0] | coleman |

CASE ASSIGNMENT SYSTEM
AUDIT TRAIL REPORT

Page    4

Transaction Dates: 04/29/2002 - 04/29/2002

| DATE | TIME | CASE NUMBER | JUDGE | CATEGORY | TRANSACTION | DATA ENTRY OPERATOR |
|---|---|---|---|---|---|---|
| 04/29/02 | 16:39:17 | N/A | Judge William M. Acker, Jr. | Habeas Corpus Cas | Deck Discarded [a:1 u:0] | coleman |
| 04/29/02 | 16:39:17 | N/A | Judge James H. Hancock | Habeas Corpus Cas | Deck Discarded [a:1 u:0] | coleman |
| 04/29/02 | 16:39:17 | N/A | Judge Inge P. Johnson | Habeas Corpus Cas | Deck Discarded [a:1 u:0] | coleman |
| 04/29/02 | 16:39:17 | N/A | Judge Sharon Lovelace Blackburn | Habeas Corpus Cas | Deck Discarded [a:1 u:0] | coleman |
| 04/29/02 | 16:39:17 | N/A | Judge Robert B. Propst | Habeas Corpus Cas | Deck Discarded [a:1 u:0] | coleman |
| 04/29/02 | 16:39:17 | N/A | Judge C. Lynwood Smith, Jr. | Habeas Corpus Cas | Deck Discarded [a:1 u:0] | coleman |
| 04/29/02 | 16:39:17 | N/A | Judge Karon O. Bowdre | Habeas Corpus Cas | Deck Discarded [a:1 u:0] | coleman |
| 04/29/02 | 16:39:17 | N/A | Magistrate T. Michael Putnam | Habeas Corpus Cas | Deck Discarded [a:1 u:0] | coleman |
| 04/29/02 | 16:39:17 | N/A | N/A | Habeas Corpus Cas | Deck Created [10 cards total] | coleman |

REMARKS: Threshold of 100% reached.  Auto reset invoked.

| DATE | TIME | CASE NUMBER | JUDGE | CATEGORY | TRANSACTION | OPERATOR |
|---|---|---|---|---|---|---|
| 04/29/02 | 16:39:17 | N/A | Judge Inge P. Johnson | Habeas Corpus Cas | Deck Created [a: 0 u: 1] | coleman |
| 04/29/02 | 16:39:17 | N/A | Judge C. Lynwood Smith, Jr. | Habeas Corpus Cas | Deck Created [a: 0 u: 1] | coleman |
| 04/29/02 | 16:39:17 | N/A | Judge U. W. Clemon | Habeas Corpus Cas | Deck Created [a: 0 u: 1] | coleman |
| 04/29/02 | 16:39:17 | N/A | Judge James H. Hancock | Habeas Corpus Cas | Deck Created [a: 0 u: 1] | coleman |
| 04/29/02 | 16:39:17 | N/A | Judge Sharon Lovelace Blackburn | Habeas Corpus Cas | Deck Created [a: 0 u: 1] | coleman |
| 04/29/02 | 16:39:17 | N/A | Judge Edwin L. Nelson | Habeas Corpus Cas | Deck Created [a: 0 u: 1] | coleman |
| 04/29/02 | 16:39:17 | N/A | Judge William M. Acker, Jr. | Habeas Corpus Cas | Deck Created [a: 0 u: 1] | coleman |
| 04/29/02 | 16:39:17 | N/A | Senior Judge J. Foy Guin | Habeas Corpus Cas | Deck Created [a: 0 u: 1] | coleman |
| 04/29/02 | 16:39:17 | N/A | Judge Robert B. Propst | Habeas Corpus Cas | Deck Created [a: 0 u: 1] | coleman |
| 04/29/02 | 16:39:17 | N/A | Judge Karon O. Bowdre | Habeas Corpus Cas | Deck Created [a: 0 u: 1] | coleman |
| 04/29/02 | 16:39:32 | 7:02CV01076 | Judge Edwin L. Nelson | Habeas Corpus Cas | Random Assignment | coleman |
| 04/29/02 | 16:41:43 | 7:02MG01076 | Magistrate T. Michael Putnam | Mag.-Habeas Corpu | Random Assignment | coleman |